# In the United States Court of Federal Claims

No. 17-1424C
**Filed: August 24, 2018**
**Reissued: September 11, 2018[1]**

* * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| ADAM L. EXNICIOS, | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | |
| Defendant. | |

**Military Pay Act; Motion to Dismiss; Cross-Motions for Judgment on the Administrative Record; Waiver; Justiciability; Unlawful Command Influence; Due Process.**

* * * * * * * * * * * * * * * * * *

**John B. Wells**, Law Office of John B. Wells, Slidell, LA.

**Daniel K. Greene**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Steven J. Gillingham**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Chad A. Readler**, Acting Assistant Attorney General. Of counsel was **Yolanda McCray Jones**, United States Army Litigation Division, Military Personnel Branch, Washington, D.C.

## O P I N I O N

<u>**HORN, J.**</u>

Plaintiff is a former Foreign Area Officer in the United States Army (Army) who was discharged from the Army on August 28, 2014, with an honorable characterization of service. On March 7, 2014, a Field Board of Inquiry recommended that plaintiff be eliminated from the Army based on misconduct and substandard performance of duty with a general, under honorable conditions, characterization of service. On July 10, 2014, an Army Board of Review for Eliminations (Board of Review) recommended that plaintiff be eliminated from the Army based on misconduct and substandard performance of duty with an honorable characterization of service. On August 6, 2014, the "Deputy Assistant

---

[1] This opinion was issued under seal on August 24, 2018. The parties were given the opportunity to propose redactions to the court. No redactions were proposed. Plaintiff stated that "the currently sealed opinion contains no materials that should be redacted before the opinion is publicly issued," and defendant also stated that "the currently sealed opinion contains no materials that should be redacted before the opinion is publicly issued." The opinion, therefore, is unsealed and issued for publication.

Secretary (Army Review Boards)" (Deputy Assistant Secretary) approved the Board of Review's recommendation that plaintiff be involuntarily eliminated from the Army based on misconduct and substandard performance of duty with an honorable characterization of service. On August 28, 2014, the Army discharged plaintiff after approximately sixteen years of military service. On October 3, 2017, plaintiff filed a complaint in the above-captioned case, asserting that the Army's decision to separate plaintiff was arbitrary and capricious and was subject to unlawful command influence. In plaintiff's cross-motion for judgment on the administrative record, plaintiff also alleges the Army's elimination proceedings deprived plaintiff of due process, the Field Board of Inquiry improperly considered evidence, and one of the Army's bases for elimination was improper.

## FINDINGS OF FACT

In 1998, plaintiff graduated from Louisiana State University and Agricultural and Mechanical College with a Bachelor of Arts degree. On August 6, 1998, plaintiff was appointed to serve as a Reserve Commissioned Officer in the Army and was assigned to the Army's Field Artillery Corps. On April 2, 1999, plaintiff states that he completed "the Field Artillery Officer Basic Course," which qualified him to "perform the duties of Platoon Leader, Fire Direction Officer, and Company Fire Support Officer." Plaintiff states that he was required to maintain a Secret security clearance as a Field Artillery Officer. On March 1, 2002, plaintiff was promoted to the rank of Captain, and, on February 1, 2008, plaintiff was promoted to the rank of Major.

In 2008, the Army began training plaintiff as a Foreign Area Officer. According to defendant, "[f]oreign area officers are commissioned officers who are 'regionally-focused experts in political military operations with advance [sic] language skills, cultural understanding, and the ability to advise senior military and civilian strategic decision-makers' on a variety subjects pertinent to the specific region on which the officer is focused." (quoting Foreign Area Officer Branch, UNITED STATES ARMY (Oct. 13 2017), https://www.hrc.army.mil/officer/foreign%20area%20officer%20branch). Plaintiff states, "[a]s a FAO [Foreign Area Officer], Exnicios was considered to be a political-military expert in the assigned area," which plaintiff indicates was Eurasia. As a Foreign Area Officer, plaintiff and defendant state that plaintiff was required to maintain a Top Secret security clearance with eligibility to access Sensitive Compartmented Information. According to plaintiff, as part of his security clearance process, plaintiff completed a government form SF-86 questionnaire for a national security position, which "required Exnicios disclose any foreign nationals with whom he had 'close and/or continuing contact.'" Plaintiff states he "underwent training on the reporting requirement," and that plaintiff's understanding was "the requirement was geared towards the time that he assumed his FAO [Foreign Area Officer] duties in Moscow."

In 2011, plaintiff graduated from Columbia University with a master's degree in international affairs. On January 10, 2012, when plaintiff "was pending assignment to DAO [Defense Attaché Office] Moscow with a flight scheduled for 11 Jan 2012," an Agent from the Defense Intelligence Agency (DIA) interviewed plaintiff. According to the DIA Agent's Report dated January 17, 2012 (DIA Agent's Report), on January 4, 2012, a confidential source had informed investigators at the DIA that plaintiff had made

unreported contact with a Ukrainian female "during a US Army training course from Jan 2011 to Apr 2011." The DIA Agent's Report indicates that plaintiff had not disclosed his contact with the Ukrainian female during an interview with DIA on June 7, 2011. The DIA Agent's Report indicates that plaintiff "passed a DIA issued Counterintelligence scope polygraph examination on 27 May 2011" before his June 7, 2011 interview.

During the January 10, 2012 interview, plaintiff disclosed that he had had unreported contact with two separate women, both of whom plaintiff identified as being Ukrainian. According to the DIA Agent's Report, plaintiff stated he had unreported contact with a Ukrainian woman named Okasana,[2] who was a Ukrainian national who worked for the Ukrainian Ministry of Foreign Affairs, when plaintiff was in Foreign Area Officer training in Germany in 2008. During his Foreign Area Officer training, plaintiffs' entire seminar, including plaintiff and Okasana, went on a trip to Washington, D.C. Plaintiff stated that he and Okasana separated from their seminar during the trip to Washington, D.C. and went on a shopping trip in Tyson's Corner, Virginia, where Okasana tried on and modeled dresses for plaintiff. Plaintiff, however, denied any intimate contact with Okasana while on the seminar trip in Washington, D.C. After plaintiff's seminar, plaintiff, and Okasana returned from Washington, D.C. to Germany, plaintiff and Okasana attended an "official function" at the Community Club at the Marshall Center in Germany. Plaintiff "advised that at the official function, HE became intoxicated and kissed" Okasana. (capitalization in original). Plaintiff's friend's wife witnessed plaintiff kiss Okasana and "threatened to tell SUBJECT's [plaintiff's] wife of the incident." (capitalization in original). The next day, plaintiff stated that he told his wife about the incident at the Community Club, and, "explained to HIS wife that he had a 'crush' on [Okasana]." (capitalization in original). Plaintiff "advised that HE felt a strong emotional bond with HER." (capitalization in original). Plaintiff, however, "denied that HE and [Okasana] had any intimate relations other than the one kiss which they shared at the official function in Germany." (capitalization in original). Plaintiff also stated that he informed Okasana that he "was truthful with HIS wife," that Okasana "was upset HE wasn't more secretive about their relationship" (capitalization in original) and plaintiff indicated that, subsequently, Okasana began dating one of their classmates. According to plaintiff, he did not maintain Okasana's contact information and Okasana did not attempt to contact him after their seminar ended in December 2008. Plaintiff "advised that HE did not report HIS contact with [Okasana] during HIS security interview with the DAC-4 Investigations Division in

---

[2] Defendant redacted from the administrative record the names of the two Ukrainian women plaintiff had unreported contact with who are discussed throughout the court's opinion. Neither plaintiff nor defendant use the names of the two women in their cross-motions for judgment on the administrative record, although, in defendant's reply, defendant uses "Ms. Black" and "Ms. Richards" as "aliases for the names of the two Ukrainian women." In plaintiff's complaint, however, plaintiff provides the names of the two Ukrainian women. In order to differentiate between the two Ukrainian women, the court uses the first names of the two women, which are Okasana and Yuliya, and the opinion will be issued under seal, with an opportunity for the parties to propose redactions before the opinion is publically issued.

Jun 2011 because HE wanted to 'disassociate' HIMSELF from the situation. HE did not want it to affect HIS job and HIS family." (capitalization in original).

During the January 10, 2012 interview, plaintiff also "admitted to being in contact with a Ukrainian female circa Spring 2011." Plaintiff stated that the other Ukrainian woman plaintiff met in the spring of 2011 was named Yuliya, and that plaintiff met Yuliya when they both were attending graduate school at Columbia University.[3] Plaintiff indicated to the DIA Agent that he and Yuliya were in the "same seminar" from January 2010 to December 2010, and, in December 2010, plaintiff and Yuliya, who plaintiff indicated "was an attractive female," went to dinner. Plaintiff and Yuliya "had a long dinner and many drinks" and "shared personal conversation," and plaintiff "asked her questions about why she was not married." Plaintiff also indicated that he discussed his family and told Yuliya that "HE did not want to 'screw up' with HIS wife/family." (capitalization in original). Plaintiff denied having any intimate contact with Yuliya and claimed that the only physical contact he had with Yuliya "was a hug goodbye after the dinner." Plaintiff stated that he and Yuliya remained "friends" on Facebook, and that his last contact with Yuliya was in the spring of 2011 when they discussed "summer plans." Plaintiff stated that he believed he had informed Yuliya that he was going to be traveling to Russia for work during the upcoming summer. The DIA Agent requested that plaintiff complete an Unofficial Foreign Contact Report "in order to document HIS contact with [Yuliya] since they were still Facebook 'friends'," which plaintiff did complete.[4] (capitalization in original). In the Unofficial Foreign Contact Report, plaintiff indicated that Yuliya's citizenship was "Ukraine," his relationship with Yuliya was "[f]riend," and that his last telephonic, written, or email contact was an "email via facebook on summer plans." In response to a question that asked "IS THIS A CLOSE OR CONTINUING RELATIONSHIP? (if yes, explain)," plaintiff wrote "was continuous as of spring 2011 — could continue in future." (capitalization in original).

Additionally, during plaintiff's January 10, 2012 interview with the DIA Agent, plaintiff indicated that, during his Foreign Area Officer training, he traveled to countries in his area of responsibility for in-country immersion, including Ukraine and Russia. While in Ukraine, plaintiff stated that he went to "gentlemen's clubs on a couple different occasions." Plaintiff asserted that he did not engage "in any intimate relations with the women, although HE did receive lap dances from the exotic dancers at the clubs." (capitalization in original). Plaintiff "denied ever going to gentlemen's club while HE was in Russia." (capitalization in original).

Also on January 10, 2012, plaintiff provided to DIA a written "Voluntary Sworn Statement," which indicated that the Voluntary Sworn Statement was "[r]egarding either

_____

[3] As discussed below, plaintiff contends that Yuliya is a naturalized United States citizen, and, therefore, is not a foreign national. Plaintiff, however, identified Yuliya as "Ukrainian" during his January 10, 2012 interview, and, in his complaint and cross-motion for judgment on the administrative record, refers to Yuliya as "Ukrainian" and as being "of Ukrainian descent."

[4] Plaintiff did not complete an Unofficial Foreign Contact Report regarding his contact with Okasana, who plaintiff met while in Foreign Area Officer training in 2008.

close or continuous contact with foreign nationals" and recounted many of the details discussed in the DIA Agent's Report. In his Voluntary Sworn Statement, plaintiff wrote that he had "close contact with [Okasana] a Ukrainian between September to November of 2008" and their contact "became at first professionally and then personally close, at times the behavior was both provacative [sic] and flirtatious." Plaintiff also indicated that he did not disclose his contact with Okasana during his security interview with DIA during the summer of 2011 because plaintiff "had generally dismissed the event from memory, I had ceased contact with [Okasana], and the juvenile aspects of it made it difficult to broach." Regarding plaintiff's contact with Yuliya, who was a classmate of plaintiff's at Columbia University, plaintiff wrote "[t]he conversations were more personal, there was no physical contact. For several months in the Spring of 2011 we coresponded [sic] through Facebook, our last correspondence was in Spring of 2011."

Two days after plaintiff's January 10, 2012 interview with the DIA Agent, on January 12, 2012, plaintiff underwent a "specific issue polygraph examination" with a Polygraph Examiner from DIA.[5] The specific issue polygraph examination "dealt with the issue of sexual intercourse with Ukrainian women since HE'd been married (which SUBJECT denied)." (capitalization in original). Prior to the start of the polygraph examination, plaintiff provided additional details regarding Okasana, who plaintiff had "denied" having "any intimate relations [with] other than the one kiss which they shared at the official function in Germany" during his January 10, 2012 interview. Plaintiff stated that, when his seminar was on a trip to Washington, D.C., Okasana had modeled dresses for him in Tyson's Corner "in a provocative manner," and, after the shopping trip, plaintiff and Okasana went to dinner in Virginia where they "held hands under the table and expressed their feelings for each other." Plaintiff also stated he and Okasana kissed during dinner and during a cab ride back to their hotel. Plaintiff stated that he and Okasana each went to their own hotel rooms upon arriving at their hotel, and plaintiff denied having engaged in any other sexual acts with Okasana during the Washington, D.C. trip. Plaintiff indicated that he was "trying to keep the relationship secret from HIS classmates and instructors" and had "learned how HE was potentially vulnerable and exploitable." (capitalization in original). Subsequently, the DIA Polygraph Examiner administered plaintiff's specific issue polygraph examination. The DIA Polygraph Examiner asked plaintiff, "[s]ince you were married, have you had sexual intercourse with any Ukrainian women?" and "[h]ave you had any form of oral sex with any Ukrainian national since you were married?" The DIA Polygraph Examiner created a polygraph examination report dated January 12, 2012 (DIA Polygraph Examiner's Report), which stated, "[o]n January 12, 2012, Subject [plaintiff] did not complete the referenced examination with no reportable information developed. This examination is predicated on a request from DAC-4 Investigations Division (ID), referencing SUBJECT's [plaintiff's] failure to reveal contact with foreign nationals, specifically Ukrainian women outside his marriage." (capitalization in original). The DIA Polygraph Examiner's Report also stated that "[n]o additional

---

[5] The DIA Agent who conducted plaintiff's January 10, 2012 interview did not administer plaintiff's January 12, 2012 polygraph examination, but the DIA Agent's Report did provide details regarding the January 12, 2012 polygraph examination. The January 12, 2012 polygraph examination was administered by a different DIA employee, whose title was "Polygraph Examiner."

polygraph testing is anticipated at this time," and that "Subject did not complete this Specific-Issue examination, and Deception was Indicated." (capitalization in original). The DIA Polygraph Examiner's Report did not indicate why plaintiff "did not complete" the polygraph examination.

## Plaintiff's General Officer Memorandum of Reprimand

On April 2, 2012, slightly less than three months after plaintiff's January 10, 2012 interview and January 12, 2012 polygraph examination, Major General Stephen G. Fogarty of the United States Army Intelligence and Security Command issued plaintiff a general officer memorandum of reprimand (GOMOR). The pertinent portion of the GOMOR stated:

> You are hereby reprimanded for violations of Army Regulation [AR] 380-67.[6]
>
> Leaders in the United States Military are expected to exemplify the highest ethical and professional standards as embodied in our Army Values. Leaders are expected to be able to read, understand, and follow regulations, directions, and orders of those appointed over them. You have failed to follow Army Regulations and failed to be forthcoming in relationships that directly impact your ability to continue to serve in your current capacity. You failed to inform the investigating agent about your close, personal relationships with two separate foreign national women, neither of which are your wife. You also admit to not informing your wife of the latter relationship, which you attest is not intimate, yet you still maintain connections through social media networks and communicate professional travel arrangements. Your failure to notify the appropriate servicing security office of close, intimate, or continuous communication or connection with a foreign national can raise questions about your reliability, trustworthiness and ability to protect classified information.

Major General Fogarty stated in the GOMOR that he intended to file the GOMOR in plaintiff's official military personnel file in accordance with AR 600-37 (2012), which sets forth policies and procedures related to the placement of unfavorable information about Army personnel in individual official personnel files. See AR 600-37, ¶ 1-1. Major General Fogarty also stated in the GOMOR that he would consider a response from plaintiff before

---

[6] The purpose of AR 380-67 (2012) is to ensure "access to classified information and assignment to sensitive positions are clearly consistent with the interests of national security." AR 380-67, ¶ 1-1. The court cites to the versions of the Army Regulations that were in effect at the time the relevant event occurred. See Dolan v. United States, 91 Fed. Cl. 111, 118 (2010) ("The Army regulations in effect at the date of plaintiff's discharge, not those currently in effect, are dispositive in this case." (citing Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005) ("As an initial matter, we note that the Army regulations in effect at the time of Chambers' discharge in 1970, rather than current regulations, guide our analysis."))).

making a final decision and informed plaintiff that plaintiff could seek legal assistance from a Legal Assistance Officer or private civilian counsel.

Plaintiff submitted a response to the GOMOR on April 11, 2012, in which plaintiff argued that he did not violate Army Regulations, asserted that he did not intentionally conceal information, and requested that Major General Fogarty reconsider the GOMOR. Plaintiff contended that there "are systemic problems that led to this situation" and stated "AR 380-67 is over two decades old.[7]  Allied nations are still considered to be antagonists, and it concerns itself with written letters when we are in the era of social media, it is anachronistic in an era of globalized travel and communication." Plaintiff also stated that the "subsequent interview [with DIA] on the other hand seems to have a great interest in the most simple of contacts and social media sites." According to plaintiff's response to the GOMOR, "in the future, other junior Foreign Area Officers will find themselves in similar situations." Additionally, plaintiff noted that he had informed his Army supervisor of the incident with Okasana at the Community Club in 2008 and stated that he "was counseled and the case was closed."

On April 16, 2012, Major John Frick sent plaintiff an email message stating that "LTC [Lieutenant Colonel] Rayburn and I spoke with LTC Cozzens about your response to the GOMOR. I understand LTC Cozzens plans to contact you about re-thinking your reply." Major Frick also stated that he "strongly suggest[s]" that plaintiff listen to LTC Cozzens and recommended that plaintiff provide a two paragraph response to the GOMOR, in which plaintiff should "acknowledge your guilt and apologize for its effect on DIA and the Army" and request that the GOMOR be filed in plaintiff's local file. Major Frick asserted that, "[w]hen it comes to GOMORs, no one cares when the officer uses his response as a rebuttal – seriously no one," and that plaintiff's "current response is likely to at least annoy the LTG; potentially it might piss her off." Major Frick concluded his email message by stating "I'm in your corner – so please trust me on this." On April 17, 2012, plaintiff replied to Major Frick's email message and indicated that he had spoken to LTC Cozzens on April 16, 2012, who informed plaintiff that he had twenty-four hours to consider his "response/tone, without going into the same details you [Major Frick] provided." Plaintiff indicated in his email message that he was pleased with his current response to the GOMOR and had received advice from legal counsel regarding how to proceed. Plaintiff also indicated that he had informed LTC Cozzens that he did not need the twenty-four hours to reconsider his response to the GOMOR, and that LTC Cozzens should proceed with filing plaintiff's April 11, 2012 response to the GOMOR. Plaintiff concluded his email message to Major Frick by stating, "[i]n any case, I appreciate your advise [sic], as you have been the only one in this process to be absolutely candid with me." That same day, Major Frick replied to plaintiff's email message and stated "I don't

---

[7] The version of AR 380-67 that plaintiff was reprimanded for violating was established on September 9, 1988. As of April 2012, when plaintiff received the GOMOR, AR 380-67 had only been updated once since September 9, 1988, which occurred in August 2011 when there was a rapid action revision of AR 380-67 that made administrative changes to AR 380-67 and implemented the Don't Ask, Don't Tell Repeal Act of 2010. See AR 380-67 (2012). The Army, however, updated AR 380-67 on January 24, 2014, which is the version remaining in effect today. See AR 380-67 (2018).

want to go against legal counsel – because I am obviously not a lawyer. Good luck in the whole thing and please let me know where they decide to file it."

On April 30, 2012, Colonel Michael J. Bochna issued a memorandum with a subject of "Commander's Recommendations on Filing Determination," in which Colonel Bochna recommended the GOMOR be placed in plaintiff's official military personnel file. Colonel Bochna asserted that plaintiff had failed to take responsibility for his actions and continued to dispute the facts and the investigators' judgment "despite the fact that most of the evidence against him was obtained from his own sworn statements and interviews." Colonel Bochna stated that plaintiff's response to the GOMOR indicated plaintiff "clearly did not take this to heart and instead chose to dispute some of the facts and to question the very policies he violated." On May 10, 2012, after reviewing plaintiff's response and Colonel Bochna's recommendation, Major General Fogarty directed that the GOMOR be placed in plaintiff's official military personnel file.

On January 14, 2014, plaintiff petitioned the Department of the Army Suitability Board (DAESB) to remove the GOMOR from his official military personnel file. Plaintiff contended that the Army had failed to follow the required procedures for issuing a GOMOR, the GOMOR process was not conducted in an objective manner, that plaintiff "was provided ineffective counsel," and that plaintiff did not violate AR 380-67 because his contacts with Okasana and Yuliya were not reportable conduct. On June 26, 2014, the DAESB, by unanimous vote, determined "[t]he evidence presented does not clearly and convincingly establish that the document under consideration is untrue or unjust, and as a result, the presumption of regularity applies" and denied plaintiff's petition. The DAESB explained that, "[a]fter a thorough review of the appellant's official record, the evidence submitted by the appellant in support of his appeal, and the circumstances surrounding the GOMOR incidents, the appellant has failed to provide clear and convincing evidence that the GOMOR is untrue or unjust."

### Revocation of Plaintiff's Security Clearance

Approximately two months after Major General Fogarty directed that the GOMOR be placed in plaintiff's official military personnel file, the United States Army Central Personnel Security Clearance Facility (USA CCF) informed plaintiff by memorandum dated July 16, 2012, which was titled "Intent to Revoke Sensitive Compartmented Information (SCI) Access Eligibility and Security Clearance," that it had "made a preliminary decision to revoke your SCI access eligibility and security clearance due to information in the Statement of Reasons." The USA CCF's "Statement of Reasons," which recounted many of the details involving the two Ukrainian women plaintiff discussed during his January 10, 2012 interview with the DIA and January 12, 2012 polygraph examination, identified information that the USA CCF asserted led to security concerns. Specifically, regarding Yuliya, plaintiff's classmate from Columbia University, the Statement of Reasons stated that plaintiff "admitted to continuing contact with this foreign national via Facebook online, disclosing your future travel abroad for work." Regarding Okasana, the Ukrainian woman plaintiff met while in Germany in 2008, the Statement of Reasons stated that plaintiff "had a relationship with a classmate, a Ukrainian female, whom [sic] worked for the Ukrainian Ministry of Foreign Affairs" and "established a strong

bond of affection towards her," and that plaintiff had indicated that he "did not report this contact in June 2011 because you wanted to 'disassociate' yourself from the situation. You did not want this to affect your job or family." The Statement of Reasons also noted that plaintiff "did not successfully complete" the specific issue polygraph examination administered by DIA on January 12, 2012.

The Statement of Reasons identified "FOREIGN INFLUENCE" and "PERSONAL CONDUCT" as the applicable personnel security guidelines plaintiff had violated. (capitalization in original). The Foreign Influence Guideline provides, in part:

> Foreign contacts and interests may be a security concern if the individual has divided loyalties or foreign financial interests, may be manipulated or induced to help a foreign person, group, organization, or government in a way that is not in U.S. interests, or is vulnerable to pressure or coercion by any foreign interest.

See 32 C.F.R. § 147.4 (2012). The Personal Conduct Guideline provides, in part:

> Conduct involving questionable judgment, lack of candor, dishonesty, or unwillingness to comply with rules and regulations can raise questions about an individual's reliability, trustworthiness and ability to protect classified information. Of special interest is any failure to provide truthful and candid answers during the security clearance process or any other failure to cooperate with the security clearance process.

See 32 C.F.R. § 147.7 (2012). The USA CCF's July 16, 2012 memorandum stated that, "[i]f you respond, submit your signed and dated response and supporting material to this headquarters through command channels within 60 days of receipt of this memorandum."

On September 11, 2012, plaintiff submitted a response to the USA CCF's July 16, 2012 memorandum, in which plaintiff denied having been under foreign influence because, according to plaintiff, he was not "bound" to any foreign individual. Regarding the issue of personal conduct, plaintiff "admit[ted] to showing poor judgment in regards to my actions in November of 2008," but argued that "[t]his was an isolated incident." Plaintiff also stated in his September 11, 2012 response that he had no intention of misleading DIA investigators, and that he was "under significant stress" during the January 10, 2012 interview and neglected some details he had forgotten or had failed to recognize as salient. Plaintiff concluded his September 11, 2012 response by stating, "[i]n the totality of the circumstances, I believe the facts of this case, mitigating circumstances, my prior record of service and potential for further service should reasonably outweigh these causes of concern that would result in a judgment to revoke my security clearance."

By memorandum dated November 14, 2012, which was titled "Determination of Sensitive Compartmented Information (SCI) Access Eligibility/Security Clearance Ineligibility," the USA CCF informed plaintiff that, after reviewing his response, "[w]e have revoked your SCI access eligibility and security clearance." According to the USA CCF's November 14, 2012 memorandum, plaintiff's response had failed to mitigate the security

concerns, and plaintiff's "failure to report, when required, association with foreign nationals after acknowledgement of training and your omission/concealment of pertinent details leaves you vulnerable to exploitation, pressure or coercion by any foreign interest." The USA CCF's memorandum also informed plaintiff that he had

> the opportunity to appeal this determination in one of two ways - either directly to the U.S. Army Personnel Security Appeals Board (PSAB) - or - through a personal appearance before the Defense Office of Hearings and Appeals (DOHA). For either option selected, the US Army PSAB will make the final decision on your appeal.

On January 15, 2013, plaintiff appealed the USA CCF's decision to revoke his SCI access eligibility and security clearance to an administrative judge with the DOHA.

During a hearing before the DOHA administrative judge, plaintiff and three witnesses provided testimony, and plaintiff submitted eight documents as exhibits. Plaintiff's exhibits included two email messages allegedly sent by Yuliya, the Ukrainian woman plaintiff had been in contact with during his time at Columbia University in 2011, to plaintiff's "representative" in the hearing before the DOHA administrative judge. In the first email message, dated February 6, 2013, Yuliya states that "I am a student at Columbia University and was a classmate of Adam Exnicios. I am a US [sic] citizen." In the second email message, which was dated February 8, 2013 and submitted to the DOHA administrative judge after the conclusion of the January 15, 2013 hearing, Yuliya stated "I am glad to hear that the hearing went well for Adam. I have been [sic] naturalized in July 2010. I, please, ask you not to contact me on this matter again." In a decision issued on April 24, 2013, the DOHA administrate judge determined that plaintiff was not subject to foreign influence because Yuliya was a naturalized United States citizen at the time of their interactions, and plaintiff was not required to report his interactions with Yuliya because she was a "U.S. citizen." Notwithstanding that plaintiff had identified Yuliya as a Ukrainian national during plaintiff's January 10, 2012 interview with the DIA Agent and completed an Unofficial Foreign Contact Report on January 10, 2012 that stated Yuliya's citizenship was "Ukraine," the administrative judge stated that plaintiff "only knew Ms. [Yuliya] as a fellow student," and "[h]e had no reason to conclude that she was a foreign national." The administrative judge also concluded that plaintiff's "'relationship'" with Okasana, the Ukrainian woman plaintiff interacted with in 2008 in Germany, "was fleeting," that plaintiff had subsequently distanced himself from Okasana, and that plaintiff had shown contrition. The administrative judge concluded, "[i]n light of Appellant's [plaintiff's] highly credible testimony and witnesses, I find that Appellant mitigated both foreign influence and personal conduct security concerns with persuasive testimony, witnesses, and documents. I recommend that the PSAB [United States Army Personnel Security Appeals Board] reverse USA CCF's action revoking Appellant's access to SCI and security clearance."

The United States Army Personnel Security Appeals Board, however, did not follow the administrative judge's recommendation and denied plaintiff's appeal of the USA CCF's decision to revoke plaintiff's access eligibility to Sensitive Compartmented Information and security clearance by memorandum dated June 26, 2013. The June 26,

2013 memorandum stated that the United States Army Personnel Security Appeals Board had convened to consider plaintiff's appeal, and that the United States Army Personnel Security Appeals Board's decision

> was based upon your failure to mitigate the following concerns addressed by the U.S. Army Central Personnel Security Clearance Facility (CCF): Personal Conduct and Foreign Influence. The Board has found your behavior to be inconsistent with the adjudicative guidelines as outlined in Appendix 8, DoD [Department of Defense] 5200.2R, "DoD Personnel Security Program," used to determine eligibility for a security clearance or access to classified information; and ICD 704 [Intelligence Community Directive], Personnel Security Standards and Procedures Governing Eligibility for Access to SCI. This decision is final and completes your due process.

The United States Army Personnel Security Appeals Board also stated that plaintiff could request reconsideration one year from the date of its June 26, 2013 memorandum.

**Plaintiff's Elimination Proceedings**

Prior to the United States Army Personnel Security Appeals Board's denial of plaintiff's appeal on June 26, 2013, by memorandum dated February 13, 2013, the United States Army Human Resources Command informed plaintiff that plaintiff needed to show cause for retention because it was initiating elimination proceedings against plaintiff "under the provisions of Army Regulation (AR) 600-8-24, paragraph 4-2(b) [(2013)], because of misconduct, moral or professional dereliction."[8] The United States Army Human Resources Command indicated it was eliminating plaintiff based on the following "specific reasons" for elimination: "a. Substantiated derogatory activity resulting in a General Officer Memorandum of Reprimand dated 2 April 2012 (Encl 1), which was filed in your Official Military Personnel File. b. Conduct unbecoming an officer as indicated by the above-referenced item." (capitalization in original). The United States Army Human Resources Command informed plaintiff that he could seek the assistance of an officer from the Judge Advocate General Corps or private counsel, and that plaintiff could submit a "rebuttal with all supporting documentation to show how you have either successfully overcome the reason for the Show Cause Proceeding or a statement explaining your past actions/behavior," submit his resignation in lieu of elimination, or request a hearing before a Field Board of Inquiry. Plaintiff elected to request a hearing before a Field Board of Inquiry.

Following the United States Army Personnel Security Appeals Board's June 26, 2013 denial of plaintiff's appeal of USA CCF's decision to revoke his SCI access eligibility and security clearance, on July 15, 2013, Colonel Danial Pick, a Commander from the

---

[8] AR 600-8-24, paragraph 4-2(b), provided that elimination action will be initiated for "[m]isconduct, moral or professional dereliction, or in the interests of national security" and provides a non-exhaustive list of examples of such conduct. See AR 600-8-24, ¶ 4-2(b).

Defense Language Institute Foreign Language Center, issued a memorandum notifying plaintiff of an additional, third basis supporting the Army's elimination proceedings against plaintiff. The July 15, 2013 memorandum provided that an "additional basis for elimination has arisen under Army Regulation (AR) 600-8-24, paragraph 4-2 (a)(10) [(2013)], substandard performance of duty. You are hereby notified to show cause for retention on active duty under AR 600-8-24, paragraph 4-2(a)(10) substandard performance of duty, due to the permanent revocation of your security clearance."[9] The July 15, 2013 memorandum also requested that plaintiff show cause for retention and provided plaintiff with an opportunity to submit a written statement and evidence in rebuttal, resign in lieu of elimination, or request a hearing before a Field Board of Inquiry. In plaintiff's response to the July 15, 2013 memorandum, plaintiff again requested an appearance before a Field Board of Inquiry.

A Field Board of Inquiry convened on March 7, 2014, at 9:00 a.m. to address the three asserted bases for plaintiff's elimination.[10] Plaintiff "was present during all open

---

[9] The regulation at AR 600-8-24, paragraph 4-2(a)(10), provided that, "[w]hen no medical problems exist, and an officer has two consecutive failures of the APFT [Army physical fitness test]," elimination action will be initiated for substandard performance of duty. Colonel Pick's July 15, 2013 memorandum does not indicate how the revocation of plaintiff's SCI security clearance and access eligibility impacted plaintiff's ability to pass the APFT. Indeed, a document in plaintiff's "Army Military Human Resource Record" indicates that plaintiff passed his most recent APFT on November 22, 2013. The regulation at AR 600-8-24, paragraph 4-2(b)(10) (2013), however, indicated that initiation of elimination proceedings for "[m]isconduct, moral or professional dereliction, or in the interests of national security" is appropriate when there has been "final denial or revocation of an officer's Secret security clearance by appropriate authorities acting pursuant to DODD [Department of Defense Directive] 5200.2-R and AR 380-67 [(2013)]." During the July 2, 2018 oral argument, counsel of record for defendant stated that the citation to AR 600-8-24, paragraph 4-2(a)(10), was a "typo." Counsel of record for defendant stated:

> They could have done either of two. He [Colonel Pick] could have left the 10 off and just left it as 4-2(a) because that would be substandard performance of duty. And it's not a stretch to think if you lose your clearance, you've failed to live up to that expectation. He could have said 4-2(b)(10), which is the loss of your secret security clearance. So it's either of those two.

The court, however, notes that both the Field Board of Inquiry, Board of Review, and Deputy Assistant Secretary found that plaintiff's loss of his security clearance constituted substandard performance of duty under AR 600-8-24, paragraph 4-2(a).

[10] The purpose of a Field Board of Inquiry is "to give the officer a fair and impartial hearing determining if the officer will be retained in the Army." AR 600-8-24, ¶ 4-6(a) (2014). The Field Board of Inquiry "establishes and records the facts of the Respondent's alleged

sessions of the board with his counsel and was afforded full opportunity to cross-examine adverse witnesses, to present evidence in his own behalf, and to testify in person either sworn or unsworn." When the President of the Field Board of Inquiry convened the Field Board of Inquiry, the President "inquired if any member desires a recess further study or review [sic] any matters. No members desired to recess." The President of the Field Board of Inquiry informed plaintiff "of his rights and privileges, including the right to full access to the records of the hearings and all documentary evidences (excluding classified documents)" and "the right to challenge for cause any members of the board." At the time, plaintiff "indicate[d] he desires a record of the proceedings" and did not challenge any of the Members of the Field Board of Inquiry for cause. The President of the Field Board of Inquiry noted that "the records in this case disclose no grounds for challenging any member for cause. There are no reasons why any members would not be able to hear the evidence submitted by the respondent and make a fair and impartial determination in the case."

The Field Board of Inquiry then received evidence from the government and from the plaintiff. Plaintiff submitted thirteen exhibits to the Field Board of Inquiry, and the government submitted ten exhibits to the Field Board of Inquiry, which included both the DIA Agent's Report and the DIA Polygraph Examiner's Report. The government also submitted as an exhibit to the Field Board of Inquiry plaintiff's official military personnel file containing plaintiff's Officer Evaluation Reports, which plaintiff states is "replete with narratives of his superb actions in the Field Artillery."

During the Field Board of Inquiry's hearing, two government witnesses testified, including the DIA Agent who had conducted plaintiff's January 10, 2012 interview regarding his alleged unreported foreign contacts and Angelica Seivwright, who stated that "I work for the US Army Garrison here at DLI; Director of Plans, Training, Mobilization and Security. . . . My office manages background investigations and security clearances of personnel assigned to DLI." The plaintiff called nine witnesses who provided testimony, as further discussed below, including plaintiff, plaintiff's father, plaintiff's wife, plaintiff's supervisor in the Army as of March 2014, two Army Colonels who knew plaintiff from when plaintiff attended the Marshall Center in Germany in 2008, an Army Major who knew plaintiff from when they were in training together at the Marshall Center, an individual from Senator David Vitter's office who "just want[ed] to express to the board that the senator has some concerns on how some of this was handled," and an Army Major who stated "I am a close friend of MAJ [Major] Exnicios." The DIA Agent testified that, during plaintiff's January 10, 2012 interview, plaintiff "documented" Yuliya as a Ukrainian citizen, not as a United States citizen, and stated that "[c]ontinuing contact is two occasion [sic] and maintaining that contact; it is ongoing, such as emailing or face booking." The second government witness stated that plaintiff's security clearance was "revocated [sic] at all levels; he currently does not have any level of clearance," but that plaintiff could reapply for reconsideration of his security clearance status in one year. Several of the witnesses called by plaintiff also indicated that plaintiff did not currently possess a valid security clearance. The second government witness and three of the witnesses called by plaintiff,

_____

misconduct, substandard performance of duty, or conduct incompatible with military service." Id.

including plaintiff, provided testimony regarding the DOHA administrative judge's recommendation that plaintiff's security clearance should not be revoked.

Additionally, two witnesses called by plaintiff specifically stated during the Field Board of Inquiry's hearing that they thought plaintiff should be retained by the Army, and eight witnesses called by plaintiff, including plaintiff, gave testimony indicating that plaintiff was a valuable asset to the Army. Plaintiff and plaintiff's father, whose title in the summarized transcript of the proceedings before the Field Board of Inquiry was listed as "COL JAG Corp, US Army Reserve (Retired)," also testified before the Field Board of Inquiry that, in their opinion, the two Ukrainian women did not qualify as reportable contacts. Plaintiff called Colonel Todd Brown, who operated the Foreign Area Officer training program plaintiff attended in Germany in 2008, as a witness. Colonel Brown stated that he brought plaintiff "in for questioning" in 2008 when plaintiff "became very friendly with one of the female students and other students had noticed." Colonel Brown stated that plaintiff "admitted that he had had more than a professional relationship with a female; had kissed her at least once, but had not engage [sic] in any other physical contact." Colonel Brown stated that he "counseled him [plaintiff] formally in writing" and placed the "counseling in his local file. It wasn't going to be part of his permanent record." Colonel Brown also testified that he "wasn't aware of any other behavior of that kind," and that plaintiff had great potential and was an excellent student. In an Officer Evaluation Report completed by Colonel Brown after he had counseled plaintiff, which was included in the record before the Field Board of Inquiry, Colonel Brown stated that plaintiff "is in the top 4 of 10 foreign area officers I senior rate" and marked a box on plaintiff's Officer Evaluation Report that indicated "OUTSTANDING PERFORMANCE, MUST PROMOTE." (capitalization in original). At 1:30 p.m., the Field Board of Inquiry closed for deliberations in private.

At 2:00 p.m., the Field Board of Inquiry reconvened. The Field Board of Inquiry then announced its findings and recommendation as follows:

FINDINGS

The board, having carefully considered the evidence before it, finds:

The allegation of misconduct under AR 600-8-24, paragraph 4-2b [(2014)], specifically that substantiated derogatory activity resulted in a General of Memorandum of Reprimand dated 2 April 2012, being file [sic] in your Official Military Personnel File, is supported by a preponderance of the evidence and does warrant elimination.

The allegation of misconduct under AR 600-8-24, paragraph 4-2b, specifically you engaged in conduct unbecoming an officer as related to the above referenced event, in the notification of proposed separation, is supported by a preponderance of the evidence and does warrant elimination.

The allegation of substandard performance of duty under AR 600-8-24, paragraph 4-2a [(2014)], specifically, that action has been taken, and your final appeal of that action denied, by appropriate authorities to permanently revoke your security clearance, in the notification of proposed separation, is supported by a preponderance of the evidence and does warrant elimination.

RECOMMENDATION

In view of the above findings, the board recommends that MAJ Adam L. Exnicios, be:

Eliminated from the United States Army with a general (under honorable conditions) characterization of service.

(capitalization in original).

The Defense Language Institute Foreign Language Center informed plaintiff by memorandum dated March 20, 2014 that the Field Board of Inquiry had recommended plaintiff's elimination from military service. On March 30, 2014, plaintiff submitted a letter of appeal to the General Officer Show Cause Authority (GOSCA),[11] Colonel Pick, who was the Commander of the Defense Language Institute and who had informed plaintiff of the additional, third basis supporting the Army's elimination proceedings by memorandum dated July 15, 2013. In his letter of appeal, plaintiff requested Colonel Pick to "thoroughly review the results of the Board of Inquiry both in regard to the recommendation to eliminate me from the Army before being allowed to request reconsideration of my security clearance in June of 2014, and in regard to the character of discharge recommended." Plaintiff also requested Colonel Pick "specifically read the findings of the Defense Office of Hearings and Appeals" and stated that he had not intended to violate any reporting requirements. Also on March 30, 2014, plaintiff submitted an appellate brief to the Board of Review. In his appellate brief, plaintiff requested that the Board of Review "render a decision of retention in the US Army." Plaintiff provided a "brief outline of the factual circumstances" and argued that the GOMOR was factually inaccurate and that the "minimal standard for the issuance of a GOMOR requires an 'objective decision by competent authority'. It is my position that the process was not in any manner objective." According to plaintiff's appellate brief, "[n]either of these two individuals [Okasana and Yuliya] was [sic] reportable under the applicable AR." Plaintiff concluded his appellate brief to the Board of Review by stating "I do not believe the recommendation of the Board can be supported by the facts in this matter or the evidence presented to the Board."

On April 4, 2014, Colonel Pick, however, recommended approval of the Field Board of Inquiry's recommendation of elimination. In his April 4, 2014 memorandum,

---

[11] When a Field Board of Inquiry recommends elimination, a GOSCA reviews the Field Board of Inquiry's recommendation and provides a recommendation of approval or disapproval of the Field Board of Inquiry's recommendation. See AR 600-8-24, Table 4-1 (2014).

Colonel Pick also stated "[t]he BOI [Board of Inquiry] recommends the officer's service upon discharge be characterized as General (Under Honorable Conditions). I recommend the officer's service upon discharge be characterized as Honorable."

Subsequently, a three-member Board of Review convened on July 10, 2014, at 11:14 a.m., to review the Field Board of Inquiry's recommendation of elimination of plaintiff.[12] The Recorder of the Board of Review stated:

> Elimination action in this case was initiated by the Commanding General United States Army Human Resources Command based on AR 600-8-24, paragraph 4-2b, because of misconduct, moral or professional dereliction. Specifically, substantiated derogatory activity resulted in the filing of a General Officer Memorandum of Reprimand, dated 2 April 2012, in Major Exnicios' Official Military Personnel File. The reprimand reflects that Major Exnicios failed to inform the agent investigating his security clearance of his close personal relationships with two separate foreign national women, neither of whom was his wife. He also failed to inform his wife of these relationships and continued to maintain the connections through social media and to communicate his professional travel arrangements. His failure to notify the appropriate servicing security office of these contacts raised questions about his reliability, trustworthiness, and ability to protect classified information. This elimination action was supplemented with additional grounds for elimination by the General Officer Show Cause Authority (GOSCA), Commander, Defense Language Institute Foreign Language Center, based on AR 600-8-24, paragraph 4-2(a)(10) due to substandard performance of duty due to the permanent revocation of Major Exnicios' security clearance.

The Record of the Board of Review also stated that plaintiff was authorized to wear:

> Among other decorations . . . the: Bronze Star Medal; Army Commendation Medal (4th award); Army Achievement Medal; National Defense Service Medal; Kosovo Campaign Medal with Bronze Service Star; Afghan Campaign Medal with Campaign Star; Global War on Terrorism Service Medal; Humanitarian Service Medal; Army Service Ribbon; Overseas Service Ribbon (2nd award); and the NATO [North Atlantic Treaty Organization] Medal.

The Recorder of the Board of Review discussed the Field Board of Inquiry's findings and recommendation that plaintiff be discharged from the Army under general conditions, as well as the GOSCA's approval of the Field Board of Inquiry's findings, and the GOSCA's recommendation that plaintiff be discharged under honorable conditions.

---

[12] A Board of Review reviews the case of an Army officer recommended for elimination by a Field Board of Inquiry and makes a recommendation to the Secretary of the Army or his designee regarding whether the Army should retain the officer. AR 600-8-24, ¶ 4-17(a) (2014). "Appearance by the respondent (or counsel) is not authorized." Id.

Additionally, each member of the Board of Review indicated that they had previously reviewed the proceedings of the Field Board of Inquiry, and the Recorder submitted to the Board of Review "for consideration of this Board the report of the proceedings of the Board of Inquiry [(Report of Proceedings)]." "[A]ll items offered (*whether or not received*) or considered as evidence," a written copy of the testimony of each witness, and the findings of the Field Board of Inquiry were included in the Report of Proceedings. (emphasis in original).

The Board of Review then closed for deliberation and vote by "secret written ballot." When the Board of Review reconvened, the Board of Review stated:

The Army Board of Review for Eliminations, having reviewed the records of this case, in closed session and by secret written ballot, finds: The Government has established by a preponderance of the evidence that:

- The allegation of misconduct under AR 600-8-24, paragraph 4-2b, specifically that substantiated derogatory activity resulted in a General Officer Memorandum of Reprimand, dated 2 April 2012, being filed in Major Exnicios' Official Military Personnel File is supported;

- The allegation of misconduct under AR 600-8-24, paragraph 4-2b, specifically that Major Exnicios engaged in conduct unbecoming an officer as related to the above referenced event, in the notification of proposed separation, is supported; and

- The allegation of substandard performance of duty under AR 600-8-24, paragraph 4-2a, specifically, that action has been taken and his final appeal of that action denied by appropriate authorities to permanently revoke his security clearance, in the notification of proposed separation is supported.

The Board of Review recommended plaintiff "be eliminated from the United States Army with an Honorable characterization of service," rather than "General (Under Honorable Conditions)," as recommended by the Field Board of Inquiry.

On August 4, 2014, a document titled "Memorandum from the Legal Section" was prepared for the Deputy Assistant Secretary's Review. The Background section of the Memorandum from the Legal Section provided:

MAJ Exnicios has about 16 years of AFS. In April 2012, MAJ Exnicios was issued a GOMOR for violating AR 380-67 by failing to report his close contacts with two foreign national women to his servicing security office and for not being forthcoming regarding those contacts in the course of interviews with the agent investigating his fitness to hold a security clearance. Although, MAJ Exnicios argues the women were not actually foreigners, but rather naturalized citizens of the United States, the facts and circumstances surrounding at least one of the relationships revealed that

he, a married man, held hands, kissed and flirted with one of the women over dinner and was seen kissing this same woman in public on a separate occasion as witnessed by the wife of a fellow officer. HRC initiated elimination in February 2013.

The Memorandum from the Legal Section also noted that the Field Board of Inquiry had recommended a general discharge, the GOSCA had recommended an honorable discharge, and the Board of Review had recommended an honorable discharge. A Senior Legal Advisor from the Legal Office then recommended that plaintiff be honorably discharged.[13]

By memorandum dated August 6, 2014, by order of the Secretary of the Army, the Deputy Assistant Secretary approved the Board of Review's recommendation to involuntarily eliminate plaintiff from the Army. The Deputy Assistant Secretary's August 6, 2014 memorandum provided:

1.  On 7 March 2014, a Board of Inquiry recommended Major Exnicios be involuntarily eliminated from the United States Army based on both misconduct and moral or professional dereliction, and substandard performance of duty, with a General (Under Honorable Conditions) characterization of service.

2.  On 10 July 2014, a Department of the Army Board of Review for Eliminations recommended Major Exnicios be involuntarily eliminated

---

[13] In its cross-motion for judgment on the administrative record, plaintiff argues that "it is the normal practice to prepare briefing sheets, usually one or two pages, for the review of the final decision maker, the Deputy Assistant Secretary. No such briefing paper was included in the Administrative Record. . . . The lack of this briefing paper offends due process." On May 8, 2018, the court issued an Order instructing defendant to submit to the court "briefing sheets" as described by defendant, if any existed. On May 15, 2018, defendant submitted to the court the Memorandum from the Legal Section, which defendant states "contains the information that would be included in what we believe Mr. Exnicios refers to as a 'briefing sheet.'" Defendant also states:

We also understand that the legal office considers such memoranda to be protected from public disclosure by either the deliberative process privilege or attorney-client privilege, and for this reason, these memoranda as a matter of course are not included in either the records of the discharge proceedings or Mr. Exnicios's Army Military Human Resources Records, which are the two sets of records that constitute the administrative record that we filed with the Court. Government counsel was unaware of these practices when it reviewed the administrative record for completeness before filing it with the Court. Given the Court's particular interest in this document and the document's mostly summary content, to the extent that any privilege exists over this document, the Government will not assert it for the purposes of this case.

from the United States Army based on both misconduct and moral or professional dereliction, and substandard performance of duty, with an Honorable characterization of service.

3. I approve the Board of Review's recommendations to involuntarily eliminate Major Exnicios from the United States Army based on both misconduct and moral or professional dereliction (Army Regulation 600-8-24, paragraph 4-2b), and substandard performance of duty (Army Regulation 600-8-24, paragraph 4-2a), with an Honorable characterization of service.

BY ORDER OF THE SECRETARY OF THE ARMY

(capitalization in original). According to a document titled "CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY," on August 28, 2014, plaintiff was discharged from the Army with an honorable characterization of service. (capitalization in original).

On October 16, 2016, plaintiff states that he requested that the Army convene a Special Board pursuant to 10 U.S.C. § 1558 (2012) to review the decision of the Field Board of Inquiry.[14] According to plaintiff, the Army denied plaintiff's request for a Special Board because 10 U.S.C. § 1558 does not apply to the decision of a Field Board of Inquiry.

**Procedural History**

Plaintiff filed his complaint in the above-captioned case on October 3, 2017. In his complaint in this court, plaintiff alleges the Army's decision to discharge plaintiff from the Army was arbitrary and capricious because "there was found to be no relationship [sic] Exnicios and the Ukrainian woman, and because the Ukrainian-American was a U.S. citizen who did not qualify as a foreign contact." Plaintiff also asserts, without any further explanation, that the decision to discharge plaintiff "was subject to unlawful command influence, which resulted in the decision to discharge Exnicios in lieu of transfer." Plaintiff requests that this court restore plaintiff "to active duty, as either a Foreign Area Officer or as a field artillery officer, and payment of income retroactive to his date of discharge,"

---

[14] A Special Board is:

[A] board that the Secretary of a military department convenes under any authority to consider whether to recommend a person for appointment, enlistment, reenlistment, assignment, promotion, retention, separation, retirement, or transfer to inactive status in a reserve component instead of referring the records of that person for consideration by a previously convened selection board which considered or should have considered that person.

10 U.S.C. § 1558.

which occurred on August 28, 2014. Plaintiff also requests that he be "returned to active duty in the grade Major (O-4) effective August 28, 2014," the GOMOR and all references to plaintiff's discharge from the Army be removed from his military record, and the court award plaintiff attorney's fees. According to plaintiff, this court has jurisdiction over his complaint pursuant to the Military Pay Act, 37 U.S.C. § 204 (2012).

On February 2, 2018, defendant filed the administrative record, as well as a motion to dismiss under Rule 12(b)(6) (2018) of the Rules of the United States Court of Federal Claims (RCFC), or, in the alternative, a motion for judgment on the administrative record under RCFC 52.1 (2018). In its motion, defendant states that "we do not challenge that the Court possesses jurisdiction over his [plaintiff's] claim." Defendant, however, argues that plaintiff has failed to present a justiciable controversy because "it is well settled that a challenge to the merits of a service secretary's discretionary decision does not present a justiciable controversy." Additionally, defendant argues that, "[a]lthough it does not appear that Mr. Exnicios is asserting this theory [unlawful command influence] as a claim for relief, to the extent that the Court construes Mr. Exnicios's complaint as doing so, that claim, too, should be dismissed under Rule 12(b)(6)" because the complaint does not contain allegations that could establish a claim for improper command influence. Alternatively, defendant asserts that this court should grant its motion for judgment on the administrative record because the administrative record establishes that the Army's decision to eliminate plaintiff was procedurally sound and supported by substantial evidence.

On April 4, 2018, plaintiff filed an opposition to defendant's motion to dismiss and a motion for judgment on the administrative record and cross-motion for judgment on the administrative. Plaintiff argues that his claim is justiciable because "[j]udicial review is always appropriate when a military decision is arbitrary and capricious." Plaintiff contends that the actions of the Field Board of Inquiry, Army Board of Review, and Deputy Assistant Secretary[15] were arbitrary and capricious because they did not consider reassigning plaintiff as a Field Artillery Officer, did not consider the "rehabilitation" of plaintiff, and prematurely eliminated plaintiff before plaintiff could reapply for his security clearance. Plaintiff also argues the decisions of the Field Board of Inquiry, Army Board of Review, and Deputy Assistant Secretary were not supported by substantial evidence. According to plaintiff, "all evidence" pointed to retention of plaintiff and the DIA Polygraph Examiner's Report should not have been considered when determining whether to eliminate plaintiff. Additionally, plaintiff contends the GOMOR and additional, third basis for elimination regarding revocation of plaintiff's security clearance were "facially defective." Plaintiff further alleges that the actions of the Field Board of Inquiry, Army Board of Review, and Deputy Assistant Secretary violated plaintiff's due process rights, and that the "entire process" was tainted by unlawful command influence.

---

[15]   In plaintiff's cross-motion for judgment on the administrative record, plaintiff interchangeably uses "the Secretary" and "the Deputy Assistant Secretary" when referring to the Deputy Assistant Secretary's August 6, 2014 decision to approve the Board of Review's recommendation to involuntarily eliminate plaintiff from the Army.

On May 22, 2018, defendant filed a reply in support of its motion to dismiss or, in the alternative, motion for judgment on the administrative record and a response in opposition to plaintiff's cross-motion for judgment on the administrative record. In its May 22, 2018 motion, defendant again argues that plaintiff's complaint has not established a justiciable controversy, and that the Army's decision to eliminate plaintiff was supported by substantial evidence. Defendant also argues that plaintiff's additional arguments that were not raised before the Field Board of Inquiry or in plaintiff's appellate brief to the GOSCA, which, according to defendant, include plaintiff's arguments relating to the DIA's polygraph examination, retention of plaintiff's security clearance, unlawful command influence, and due process, are waived because "the scope of the Court's review is limited to the issues Mr. Exnicios presented to the military during his discharge proceedings."

On June 12, 2018, plaintiff submitted a reply in support of the cross-motion for judgment on the administrative record, in which plaintiff reiterates that the Army's actions were arbitrary and capricious, tainted by unlawful command influence, and deprived plaintiff of due process. Plaintiff also reasserts that both the GOMOR and plaintiff's notice of an additional, third basis of elimination were "facially defective" and further argues that "the arguments in the cross-motion were not waived" because "the government has invoked and misapplied the doctrine of waiver." Subsequently, on July 2, 2018, the court heard oral argument in the above-captioned case.

## DISCUSSION

In examining what must be pled in order to state a claim, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2) (2018); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The United States Supreme Court has stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [Conley v. Gibson, 355 U.S. 41, 47 (1957)]; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes,

416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56, 570 (footnote and other citations omitted; omissions in original); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57, 570); Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016); A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)); Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354-55 (Fed. Cir.), cert. denied, 562 U.S. 830 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)); Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570)), reh'g denied (Fed. Cir.), cert. denied, 557 U.S. 937 (2009); Christen v. United States, 133 Fed. Cl. 226, 229 (2017); Christian v. United States, 131 Fed. Cl. 134, 144 (2017); Vargas v. United States, 114 Fed. Cl. 226, 232 (2014); Fredericksburg Non-Profit Housing Corp. v. United States, 113 Fed. Cl. 244, 253 (2013), aff'd, F. App'x 1004 (Fed. Cir. 2014); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 726-27 (2010), appeal dismissed, 454 F. App'x 900 (Fed. Cir. 2011); Legal Aid Soc'y of New York v. United States, 92 Fed. Cl. 285, 292, 298 n.14 (2010).

When deciding a case based on a failure to state a claim, the court "must accept as true the factual allegations in the complaint." Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1355 (Fed. Cir. 2011); see also Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002)))); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190 (1984); Harris v. United States, 868 F.3d 1376, 1379 (Fed. Cir. 2017) (citing Call Henry, Inc. v. United States, 855 F.3d 1348, 1354 (Fed. Cir. 2017)); United Pac. Ins. Co. v. United

States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

**Justiciability**

In plaintiff's complaint, plaintiff alleges that the "decision to discharge Exnicios from the Army was arbitrary and capricious." Defendant argues that plaintiff's complaint must be dismissed for failure to state a claim because plaintiff's complaint fails to present a justiciable claim. Defendant contends that plaintiff's complaint "takes issue only with the merits of the 'discretionary decision' by the Secretary to approve the recommendation by the Board of Review that Mr. Exnicios should be eliminated from the Army." According to defendant, "'the merits of a decision committed wholly to the discretion of the military are not subject to judicial review,' although allegations that an applicable procedure was not followed 'may present a justiciable controversy.'" (quoting Adkins v. United States, 68 F.3d 1317, 1323 (Fed. Cir. 1995) (emphasis in original)).

Plaintiff, however, asserts that his claims are justiciable because "[j]udicial review is always appropriate when a military decision is arbitrary and capricious." Plaintiff, without citation to any tests or standards applicable to plaintiff's elimination proceedings before the Field Board of Inquiry, Board of Review, or Deputy Assistant Secretary, argues, "[i]n the instant case, there are identifiable and measurable tests and standards promulgated by the Secretary, which are subject to judicial review."[16] Plaintiff argues that "[d]efendant's justiciability argument can prevail, if at all, only if they can show that the matter at hand is recognized as a political question," which, according to plaintiff, "defendant cannot show." In its reply, defendant argues that "the Court should disregard the section of his [plaintiff's] brief related to justiciability" because plaintiff cites to case law which does not support plaintiff's position.

"In the military arena, because of the admonition against court interference with military matters, see Orloff v. Willoughby, 345 U.S. 83, 94, 73 S. Ct. 534, 97 L. Ed. 842 (1953), justiciability is an especially appropriate inquiry." Roth v. United States, 378 F.3d 1371, 1385 (Fed. Cir. 2004) (citing Adkins v. United States, 68 F.3d at 1322 (quoting Murphy v. United States, 993 F.2d 871, 872 (Fed. Cir. 1993))); see also Houghtling v. United States, 114 Fed. Cl. 149, 157 (2013); Strickland v. United States, 69 Fed. Cl. 684, 698 ("The United States Court of Appeals for the Federal Circuit repeatedly has emphasized the duty of the court, in cases concerning military personnel and benefits, to be mindful of the import of the doctrine of justiciability, i.e., whether the dispute is one within the competency of the court."), subsequent determination, 73 Fed. Cl. 631 (2006).

---

[16] Plaintiff states that "[t]he gravamen of this case, however, is not whether or not the military improperly revoked his access to TS (SCI) for that question clearly is non-justiciable." (citing Dep't of Navy v. Egan, 484 U.S. 518 (1988)). During the July 2, 2018 oral argument, counsel of record for plaintiff stated that the revocation of a security clearance is "non-reviewable" and "that's why we are not here to say revocation of the top secret/SCI was wrong, because that is non-justiciable."

Justiciability depends on whether "'the duty asserted can be judicially identified and its breach judicially determined, and . . . protection for the right can be judicially molded.'" Adkins v. United States, 68 F.3d at 1322 (quoting Baker v. Carr, 369 U.S. 186, 198 (1962)); see also Murphy v. United States, 993 F.2d at 872; Lippmann v. United States, 127 Fed. Cl. 238, 243 (2016); Volk v. United States, 111 Fed. Cl. 313, 324-25 (2013). Accordingly, a "controversy is 'justiciable' only if it is 'one which the courts can finally and effectively decide, under tests and standards which they can soundly administer within their special field of competence.'" Voge v. United States, 844 F.2d 776, 780 (Fed. Cir. 1988) (quoting Greene v. McElroy, 254 F.2d 944, 953 (D.C. Cir. 1958), rev'd on other grounds, 360 U.S. 474 (1959)); see also Lippman v. United States, 127 Fed. Cl. at 243 (quoting Voge v. United States, 844 F.2d at 780); Miglionico v. United States, 108 Fed. Cl. 512, 520-21 (2012) (citations omitted).

"The general rule is that the determination of who is fit for military service is committed to the Executive branch." Lee v. United States, 32 Fed. Cl. 530, 540 (1995) (citing Maier v. Orr, 754 F.2d 973, 982 (Fed. Cir. 1985)); see also Orloff v. Willoughby, 345 U.S. at 93 ("[J]udges are not given the task of running the Army."); Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983) ("It is equally settled that responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province; and that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." (footnotes omitted)); Taylor v. United States, 33 Fed. Cl. 54, 58 (1995). The United States Court of Appeals for the Federal Circuit has recognized "there are 'thousands of [ ] routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence or the jurisdiction of courts to wrestle with.'" Murphy v. United States, 993 F.2d at 873 (alteration in original) (quoting Voge v. United States, 844 F.2d at 780); see also Antonellis v. United States, 106 Fed. Cl. 112, 115 (2012) (citation omitted), aff'd, 723 F.3d 1328 (Fed. Cir. 2013). The United States Court of Appeals for the Federal Circuit also has "consistently recognized that, although the merits of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy." Adkins v. United States, 68 F.3d at 1323 (emphasis in original) (citing Murphy v. United States, 993 F.2d at 873; and Dodson v. Dep't of Army, 988 F.2d 1199, 1207 n.7, reh'g denied (Fed. Cir. 1993)); see also Miller v. United States, 120 Fed. Cl. 772, 781 (2015) (quoting Adkins v. United States, 68 F.3d at 1323). Judicial review, therefore, is appropriate when "the Secretary's discretion is limited, and Congress has established 'tests and standards' against which the court can measure his conduct." Murphy v. United States, 993 F.2d at 873 (citing Sargisson v. United States, 913 F.2d 918, 922 (Fed. Cir. 1990); and Voge v. United States, 844 F.2d at 780); see also Adkins v. United States, 68 F.3d at 1323 (citing Murphy v. United States, 993 F.2d at 873); Houghtling v. United States, 114 Fed. Cl. at 157 (citing Murphy v. United States, 993 F.2d at 873); Antonellis v. United States, 106 Fed. Cl. at 115 (quoting Murphy v. United States, 993 F.2d at 873); Taylor v. United States, 33 Fed. Cl. at 58 (citing Murphy v. United States, 993 F.2d at 873). "Even when that discretion is unlimited, however, the military is 'bound to follow its own procedural regulations if it chooses to implement some.'" Houghtling v. United States, 114 Fed. Cl. at 157 (quoting Murphy v. United States, 993 F.2d at 873); see also Fisher v. United States, 402 F.3d 1167, 1177 (Fed. Cir. 2005)

("A court may decide whether the military has complied with procedures set forth in its own regulations because those procedures by their nature limit the military's discretion." (citation omitted)).

Plaintiff in the case before this court specifically challenges the recommendation of the Field Board of Inquiry, the recommendation of the Board of Review, and the decision of Deputy Assistant Secretary to eliminate plaintiff from the service as arbitrary and capricious and asserts that the decisions of the Field Board of Inquiry, Board of Review, and the Deputy Assistant Secretary were not supported by substantial evidence. Pursuant to 10 U.S.C. § 1181(a) (2012):

> Subject to such limitations as the Secretary of Defense may prescribe, the Secretary of the military department concerned shall prescribe, by regulation, procedures for the review at any time of the record of any commissioned officer (other than a commissioned warrant officer or a retired officer) of the Regular Army, Regular Navy, Regular Air Force, or Regular Marine Corps to determine whether such officer shall be required, because his performance of duty has fallen below standards prescribed by the Secretary of Defense, to show cause for his retention on active duty.

Section 1181(b) of Title Ten of the United States Code provides that the "Secretary of the military department concerned" may also prescribe such procedures "because of misconduct, because of moral or professional dereliction, or because his retention is not clearly consistent with the interests of national security, to show cause for his retention on active duty." The Secretary of the military department concerned shall convene Boards of Inquiry "at such times and places as the Secretary may prescribe to receive evidence and make findings and recommendations as to whether an officer who is required under section 1181 of this title to show cause for retention on active duty should be retained on active duty." 10 U.S.C. § 1182 (2012). "A board of inquiry shall give a fair and impartial hearing to each officer required under section 1181 of this title to show cause for retention on active duty," and, "[i]f a board of inquiry determines that the officer has failed to establish that he should be retained on active duty, it shall recommend to the Secretary concerned that the officer not be retained on active duty." Id. § 1182(b)-(c). "The Secretary of the military department concerned may remove an officer from active duty if the removal of such officer from active duty is recommended by a board of inquiry convened under section 1182 of this title." Id. § 1184 (2012). If, however, "a board of inquiry determines that the officer has established that he should be retained on active duty, the officer's case is closed." Id. § 1182(d).

Department of Defense Instruction 1332.30 (2014) and AR 600-8-24 (2014) both provide guidance regarding the procedures afforded to an Army officer facing involuntary elimination. Department of Defense Instruction 1332.30, the subject of which is "Separation of Regular and Reserve Commissioned Officers," applies to all military departments and "[e]stablishes DoD policy, assigns responsibilities, and provides procedures governing separation of regular and reserve commissioned officers." Dep't of

Def. Instruction 1332.30 ¶¶ 1(b), 2(a) (2014).[17] Similarly, AR 600-8-24, titled: "Officer Transfers and Discharges," "provides principles of support, standards of service, policies, tasks, rules, and steps governing all work required to support officer transfers and discharges." AR 600-8-24, ¶ 1-1. Chapter 4 of AR 600-8-24 governs elimination of officers in the Army. See AR 600-8-24, ¶ 4-1. The regulation at AR 600-8-24, paragraph 4-1, provides:

> An officer is permitted to serve in the Army because of the special trust and confidence the President and the nation have placed in the officer's patriotism, valor, fidelity, and competence. An officer is expected to display responsibility commensurate to this special trust and confidence and to act with the highest integrity at all times. However, an officer who will not or can not maintain those standards will be separated.

Id. ¶ 4-1(a).

The regulation at AR 600-8-24, paragraph 4-2, titled: "Reasons for elimination," states, "[w]hile not all inclusive, when one of the following or similar conditions exist, elimination action may be or will be initiated as indicated below for– a. Substandard performance of duty. . . . b. Misconduct, moral or professional dereliction, or in the interests of national security." See also Dep't of Def. Instruction 1332.30, Encl. 2 (listing substandard performance of duty and acts of misconduct or moral or professional dereliction as reasons for separation). AR 600-8-24, paragraph 4-2(a) and paragraph 4-2(b), each provide non-exhaustive lists of examples of what constitutes substandard performance of duty and misconduct and moral or professional dereliction. Pursuant to AR 600-8-24, Table 4-1, "[o]nly applicable reasons as outlined in paragraph 4–2 [of AR 600-8-24] that can be supported by specific factual allegations and evidence may be the basis for elimination."

When an officer appears before a Field Board of Inquiry, the Field Board of Inquiry "is to give the officer a fair and impartial hearing determining if the officer will be retained in the Army" and establish "the facts of the Respondent's alleged misconduct, substandard performance of duty, or conduct incompatible with military service." AR 600-8-24, ¶ 4-6(a). Pursuant to AR 600-8-24, paragraph 4-6:

> Based upon the findings of fact established by its investigation and recorded in its report, the board then makes a recommendation for the officer's disposition, consistent with this regulation. The Government is responsible to establish, by preponderance of the evidence, that the officer has failed to maintain the standards desired for their grade and branch or that the

---

[17] The court cites to and analyzes the 2014 version of Department of Defense Instruction 1332.30 because the Field Board of Inquiry was convened in 2014 and plaintiff was discharged in 2014. Department of Defense Instruction 1332.30 was updated on March 31, 2017. See Dep't of Def. Instruction 1332.30 (2017). The relevant portions of Department of Defense Instruction 1332.30 as applicable to plaintiff's elimination proceeding in 2014, however, were unaffected by the March 31, 2017 update.

> officer's Secret-level security clearance has been permanently denied or
> revoked by appropriate authorities acting pursuant to DODD 5200.2-R and
> AR 380-67. In the absence of such a showing by the Government, the board
> will retain the officer.

Id. The Field Board of Inquiry must make "a separate finding (including a brief statement) on each factual allegation and reason for involuntary separation. The [Field] Board [of Inquiry] will render findings of fact, supported by a preponderance of the evidence, that describe specific relevant conduct by the Respondent in sufficient detail to support the Board's recommendation." Id. ¶ 4-15(b)(2); see also Dep't of Def. Instruction 1332.30, Encl. 3 ¶ 3(c) ("The Board of Inquiry makes findings on each reason for separation and recommends whether a respondent should be retained in the military service. . . . The Board of Inquiry's findings must be supported by a preponderance of the evidence." (emphasis added)). If the Field Board of Inquiry recommends retention of an officer, the officer's elimination proceedings will be closed. AR 600-8-24, Table 4-1; see also Dep't of Def. Instruction, Encl. 3 ¶ 4(1).

If the Field Board of Inquiry recommends that an officer be eliminated from the Army, the officer's case will be referred to a Board of Review. AR 600-8-24, ¶ 4-17(a). "The Board of Review, after thorough review of the records of the case, will make recommendations to the Secretary of the Army or his designee as to whether the officer should be retained in the Army." Id. If the Board of Review recommends retention of an officer, the officer's case will be closed. Id. ¶ 4-17(c)(1). If, however, the Board of Review recommends elimination of the officer, the Board of Review's "recommendation will be transmitted to the Secretary of the Army or his designee, who makes the final decision." Id. ¶ 4-17(c)(2).

In the above-captioned case, the United States Army Human Resources Command stated that it was initiating elimination proceedings for two reasons against plaintiff "under the provisions of Army Regulation (AR) 600-8-24, paragraph 4-2(b), because of misconduct, moral or professional dereliction." Plaintiff's elimination proceedings later were supplemented with an additional basis for elimination "under Army Regulation (AR) 600-8-24, paragraph 4-2 (a)(10), substandard performance of duty." Department of Defense Instruction 1332.30 and AR 600-8-24 both required that the Field Board of Inquiry make findings on each basis for separation, and that the Field Board of Inquiry's findings be supported by a preponderance of the evidence. See AR 600-8-24, ¶¶ 4-6(a), 4-15(b)(2); Dep't of Def. Instruction 1332.30, Encl. 3 ¶ 3(c). Specifically, under AR 600-8-24, paragraph 4-6, the government was responsible for establishing, by a preponderance of the evidence, "that the officer has failed to maintain the standards desired for their grade and branch or that the officer's Secret-level security clearance has been permanently denied or revoked by appropriate authorities acting pursuant to DODD 5200.2-R and AR 380-67." AR 600-8-24, ¶ 4-6(a). If the government could not meet its burden under AR 600-8-24, then AR 600-8-24 required that "the board will retain the officer." Id. Army Regulation 600-8-24, therefore, limited the discretion of the Field Board of Inquiry and required the Field Board of Inquiry to retain plaintiff if the Army did not support its bases for elimination by a preponderance of the evidence. Because AR 600-8-24 provides procedures and standards pursuant to which the Field Board of Inquiry

must operate when reviewing the recommendation to eliminate plaintiff, plaintiff's claim that his elimination proceeding was conducted in an arbitrary and capricious manner and was not supported by substantial evidence is justiciable and reviewable by this court. See Murphy v. United States, 993 F.2d at 873 ("A court may appropriately decide whether the military followed procedures because by their nature the procedures limit the military's discretion. The court is not called upon to exercise any discretion reserved for the military, it merely determines whether the procedures were followed by applying the facts to the statutory or regulatory standard."); see also Fisher v. United States, 402 F.3d at 1177 ("A court may decide whether the military has complied with procedures set forth in its own regulations because those procedures by their nature limit the military's discretion." (citation omitted)).

## Waiver

In addition to challenging the manner and merits of the Army's decision to discharge plaintiff, and arguing that the Army should have retained plaintiff, in plaintiff's April 4, 2018 cross-motion for judgment on the administrative record, plaintiff argues: (1) that the Field Board of Inquiry improperly considered the Polygraph Examiner's Report regarding plaintiff's January 12, 2012 polygraph examination; (2) that the additional, third basis regarding the revocation of plaintiff's security clearance was "facially defective" and that "[t]he record does not show that Exnicios lost his Secret clearance;" (3) that the elimination proceedings were tainted by unlawful command influence because Major Frick's email messages to plaintiff indicate that LTC Cozzens "pressure[d]" Major Frick to alter his response to the GOMOR and because Colonel Pick, the GOSCA, signed the additional, third basis for elimination and appointed the Members of the Field Board of Inquiry, which plaintiff asserts indicated Colonel Pick's "desire to see Exnicios separated" to the Members of the Field Board of Inquiry; (4) that the Army did not provide plaintiff with due process because plaintiff did not receive adequate notice of the bases for elimination and plaintiff was not permitted to cross-examine the Polygraph Examiner or the individual that provided the anonymous tip to DIA regarding plaintiff's alleged unreported foreign contacts; and (5) that the GOMOR was inaccurate and "should not have been presented to the BOI."

Defendant argues that plaintiff has waived several of these claims by not presenting his claims to the Board of Inquiry or raising his claims in "his appellate brief to his commanding officer."[18] Defendant asserts that, in his motion for judgment on the administrative record, plaintiff

      raises the following issues: (1) objections related to the polygraph examination the Defense Intelligence Agency (DIA) administered on

---

[18] When discussing what defendant identifies as plaintiff's "appellate brief to his commanding officer," defendant cites to a page range in the administrative record that includes plaintiff's March 30, 2014 letter of appeal, which is addressed to "Colonel D. Pick," and plaintiff's March 30, 2014 appellate brief to the Board of Review, which is addressed to the "Board of Review."

January 12, 2012;[19] (2) he retained his secret security clearance, and he therefore could have been retained; (3) a claim of unlawful command influence;[20] (4) his due process rights were violated; and (5) he would have been retained if the Army had weighed the evidence properly.

According to defendant, with the exception of the last issue regarding the weight of the evidence, plaintiff did not raise any of the issues now identified in his motion for judgment on the administrative record in his "discharge proceedings," and, therefore, plaintiff waived judicial review of those four issues "because the Court's review is limited to the issues Mr. Exnicios presented to the military during his discharge proceedings." Defendant argues that "a plaintiff waives judicial review of a known objection that he failed to raise during administrative proceedings," and that "the waiver doctrine applies to bar judicial review of objections that a plaintiff failed to make in proceedings before a BOI." Defendant, in an attempt to support its position that a plaintiff waives judicial review of an objection that is not raised in a proceeding before a Board of Inquiry, cites Snakenberg v. United States, 15 Cl. Ct. 809, 813 (1988), and Waller v. United States, 198 Ct. Cl. 908, 461 F.2d 1273, 1277 (1972), as examples of cases in which an argument has not been raised before a Board of Inquiry and has been deemed waived.

Plaintiff argues that, "[w]hile there are some instances when waiver applies in the administrative arena, they do not apply here" because "Exnicios did not seek the permissive remedy of a correction board. Had he done so, the government's argument concerning waiver might make more sense. Since he chose not to do so, however, the [waiver] doctrine does not apply." According to plaintiff:

> The government then tries to bootstrap their waiver theory by referring to Snakenberg v. United States, 15 Cl. Ct. 809, 813 (1988) for the proposition that issues not presented to a board of inquiry are waived. Again the defendant is wrong. As a threshold matter, this was another military correction board case. Id. at 812. Additionally, Snakenberg, held that the

---

[19] Defendant asserts that plaintiff's argument regarding the polygraph examination

contains three arguments: the polygraph examination report (part of Government exhibit 3 admitted into evidence by the BOI) should not have been considered during the discharge proceedings, the Army failed to provide the raw polygraph data to Mr. Exnicios, and the Army should have made available for cross-examination during the BOI proceedings the persons involved in administering the polygraph examination and interpreting its results.

[20] Defendant argues that plaintiff's complaint fails to state a claim for unlawful command influence. In his complaint, plaintiff baldly states that "[t]he decision to discharge Exnicios was subject to unlawful command influence, which resulted in the decision to discharge Exnicios in lieu of transfer." Plaintiff, however, tries to provide some additional details supporting his unlawful command influence claim in his cross-motion for judgment on the administrative record.

introduction of certain evidence was waived because there was no objection. Id. at 813. Snakenberg did not address whether issues not presented to a correction board waived review by a later court. There is no authority allowing this Court to extend the more limited Snakenberg holding. The same holds true for the other case cited by the government, which dealt with the admission of evidence, not issues, claims or causes of action. Waller v. United States, 461 F.2d 1273, 1277 (Ct. Cl. 1972).

(footnote omitted).

"It is well established that military correction boards provide a 'permissive administrative remedy' for wrongful discharge and that 'an application to a correction board is therefore not a mandatory prerequisite to filing a Tucker Act suit challenging the discharge.'" Klingenschmitt v. United States, 119 Fed. Cl. 163, 182 (2014) (quoting Martinez v. United States, 333 F.3d 1295, 1304 (Fed. Cir. 2003) (citation omitted)), aff'd, 623 F. App'x 1013 (Fed. Cir. 2015); see also Doyle v. United States, 220 Ct. Cl. 285, 311, 599 F.2d 984, 1000 ("[W]e have never held that a petition to the Correction Board is a mandatory administrative remedy . . . ." (citation omitted)), amended sub nom. In re Doyle, 220 Ct. Cl. 326, 609 F.2d 990 (1979), cert. denied 446 U.S. 982 (1980)). In situations in which a plaintiff seeks relief from a military corrections board "and later brings suit in court, any argument not previously raised before the corrections board is waived." Parks v. United States, 127 Fed. Cl. 677, 680 (2016) (citing Metz v. United States, 466 F.3d 991, 998 (Fed. Cir. 2006); and Doyle v. United States, 220 Ct. Cl. 285, 599 F.2d 984); see also Walls v. United States, 582 F.3d 1358, 1367 (Fed. Cir. 2009) (concluding that judicial review of decisions of military correction boards is review of the administrative record conducted under the Administrative Procedure Act); Metz v. United States, 466 F.3d at 999 (determining that plaintiff waived his argument of ineffective counsel in front of the United States Court of Federal Claims because he failed to raise the issue in the first instance with the Air Force Board for the Correction of Military Records); Murakami v. United States, 398 F.3d 1342, 1354 (Fed. Cir. 2005) (holding that the United States Court of Federal Claims correctly concluded that plaintiff waived his argument concerning his father's constructive travel restriction by not first raising the argument with the administrative agency); Spellissy v. United States, 103 Fed. Cl. 274, 283 (2012) ("When a service member chooses first to petition a military correction board, the Court of Federal Claims' review is limited to the administrative record." (citations omitted)); Shaw v. United States, 100 Fed. Cl. 259, 260 (2011) ("Matters not presented to the ABCMR [Army Board for Correction of Military Records] are considered to be waived." (citing Metz v. United States, 466 F.3d at 998)); Prochazka v. United States, 90 Fed. Cl. 481, 497 (2009) ("As a general rule, failure to present an issue before a correction board waives a later raised claim." (citing Doyle v. United States, 220 Ct. Cl. 285, 599 F.2d 984)); Neutze v. United States, 88 Fed. Cl. 763, 774-75 (2009) ("In evaluating a Board decision, the court may not consider new arguments not raised before the Board." (citing Sanders v. United States, 219 Ct. Cl. 285, 594 F.2d 804, 811 (1979))); Barnick v. United States, 80 Fed. Cl. 545, 560 (2008) ("The court will not consider materials that were not presented to a review board." (internal citations omitted)), aff'd, 591 F.3d 1372, 1374 (Fed. Cir. 2010). The waiver doctrine has been applied to officers who fail to raise argument before a military corrections board because "'[s]imple fairness to those who are engaged in the tasks of

administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.'" See Metz v. United States, 466 F.3d at 999 (quoting United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952)); see also Klingenschmitt v. United States, 119 Fed. Cl. at 183 (stating that the policies promoted by "Metz and similar cases" is "allowing an agency to correct its own errors and respecting the administrative process"); Pearl v. United States, 111 Fed. Cl. 301, 310 (2013) ("Although issues not raised before the administrative body whose decision is being challenged are ordinarily deemed waived, the rationale for that rule is that the agency whose actions are being challenged should have a chance to correct any errors during its administrative adjudicatory process." (citations omitted)). This rule "ensures that agencies will have the opportunity to develop their positions and correct their errors before an appeal." Village of Barrington, Ill, v. Surface Transp. Bd., 636 F.3d 650, 655 (D.C. Cir. 2011) (citing United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. at 37).

Plaintiff, however, correctly notes that he did not challenge the Army's decision to eliminate plaintiff from the Army at a military corrections board.[21] There is limited case law analyzing the applicability of the waiver doctrine in the context of a Field Board of Inquiry or similar tribunal. In Snakenberg v. United States, a Major in the United States Marine Corps (Marine Corps) was arrested for secretly videotaping women who were changing into bathing suits without their knowledge or consent. Snakenberg v. United States, 15 Cl. Ct. at 811. The Marine Corps convened a Board of Inquiry to investigate the Major's conduct, and the Board of Inquiry concluded that the Major was "guilty" of conduct unbecoming an officer and sexual perversion and recommended the Major be discharged from the Marine Corps. See id. Subsequently, a Board of Review "adopted" the Board of Inquiry's findings and recommendation, and the Major was involuntarily discharged. See id. at 812. The Major challenged the Board of Inquiry's decision before the Board for Correction of Naval Records, and the Board for Correction of Naval Records affirmed the Board of Inquiry's decision. See id. The Major then filed a complaint in the United States Claims Court, arguing that the Board of Inquiry improperly relied on evidence when reaching its conclusion that that the Major was "guilty" of conduct unbecoming an officer and sexual perversion. See id. at 812-13. The United States Claims Court determined that:

> [P]laintiff's argument that he was not aware that the BOI would rely on additional evidence is of no moment. Plaintiff waived future objection to the utilization of such evidence by failing to make a timely objection at the discharge hearing. See Merson v. United States, 185 Ct. Cl. 48, 58, 401 F.2d 184, 189 (1968) (ruling that the government waived any possible objection to evidence by failing to object at its introduction); Moylan v. Department of Transportation, FAA, 735 F.2d 524, 525 (Fed. Cir. 1984). Plaintiff did not make a timely objection to the BOI's consideration of this evidence, although he had the opportunity to do so at the hearing.

---

[21] During the July 2, 2018 oral argument, counsel of record for plaintiff stated that, "[m]y client, on my advice, opted not to" go to a corrections board.

Id. at 813 (footnote omitted).

Similarly, in Frecht v. United States, an Army officer appeared before a Board of Inquiry regarding possible elimination based on "misconduct, moral or professional dereliction." See Frecht v. United States, 25 Cl. Ct. 121, 124 (1992). The Board of Inquiry recommended that the officer be discharged from the Army, and a Board of Review "sustained the BOI's recommendations." Id. at 126. Subsequently, the Army discharged the officer, and plaintiff sought review of the Army's decision at the Army Board for Correction of Military Records, which determined that the officer's "elimination process was conducted in accordance with applicable law and regulations." Id. The officer then challenged the Board of Inquiry's recommendation in the United States Claims Court. See id. at 128. In a footnote, the Claims Court stated:

> The court also does not consider plaintiff's argument that due to Col. Keaveney's participation in the BOI proceedings he was robbed of an impartial and fair hearing. His challenge concerning Col. Keaveney was not raised or argued before the BOI. Failure to timely raise objections and issues to a board of inquiry constitutes a waiver of that right in subsequent litigation. Snakenberg v. United States, 15 Cl. Ct. 809, 813 (1988).

Id. at 131 n.7.

Likewise, in Waller v. United States, "a career airman in the Air Force" was discharged after a "board of officers" recommended that the career airman be discharged from the Air Force after county police arrested the career airman for exposing himself to two women. Waller v. United States, 198 Ct. Cl. 908, 910, 912, 461 F.2d 1273, 1274, 1276 (1972) (per curiam). In the United States Court of Claims, the career airman argued that the board of officers improperly considered a written statement made by the career airman while in the custody of the county police. Id. at 914, 461 F.2d at 1276. The United States Court of Claims found that the career airman had waived his right to challenge the admissibility of the written statement by failing to object to the admission of the written statement when the written statement was introduced into evidence before the board of officers. Id. at 914-15, 461 F.2d at 1276-77.

In the above-captioned case, in addition to challenging the merits of plaintiff's elimination proceedings in plaintiff's complaint, in his April 4, 2018 cross-motion for judgment on the administrative record, plaintiff also argues that it was improper for the Field Board of Inquiry to consider the Polygraph Examiner's Report concerning plaintiff's January 12, 2012 polygraph examination because "the raw polygraph data, such as the charts, was not made available for review and analysis," that the additional, third basis for elimination regarding the revocation of plaintiff's security clearance was facially defective because the notice cited the wrong subsection in AR 600-8-24, paragraph 4-2, and that the administrative record does not indicate that the Army revoked plaintiff's Secret security clearance. Plaintiff also asserts in his motion for judgment on the administrative record that his elimination proceedings were tainted by unlawful command influence because Major Frick's email messages to plaintiff demonstrate that LTC

Cozzens was attempting to "pressure" Major Frick "to urge Exnicios to change his rebuttal to the GOMOR and to virtually acknowledge the facts in the GOMOR." Plaintiff also contends unlawful command influence "permeated" plaintiff's elimination proceedings because Colonel Pick, the GOSCA, signed the additional, third basis for elimination regarding the revocation of plaintiff's security clearance and appointed the members of the Field Board of Inquiry, which plaintiff asserts "had the effect of telegraphing the Colonel's desire to see Exnicios separated." Additionally, plaintiff alleges that the Army did not provide plaintiff with due process because plaintiff "was not provided with adequate notice of what he was being charged with," and plaintiff was not permitted to confront the Polygraph Examiner or the individual that provided the anonymous tip to DIA regarding plaintiff's alleged unreported foreign contacts.

Nothing in the summarized transcript[22] of plaintiff's proceedings before the Field Board of Inquiry, in plaintiff's letter of appeal to the GOSCA, or in plaintiff's appellate brief to the Board of Review indicates that plaintiff objected to the introduction of the Polygraph Examiner's Report into the evidence before the Field Board of Inquiry. By failing to object to the introduction of the Polygraph Examiner's Report into the evidence received by the Field Board of Inquiry, plaintiff waived his ability to assert that the Field Board of Inquiry improperly consider the Polygraph Examiner's Report. See Snakenberg v. United States, 15 Cl. Ct. at 811; see also Waller v. United States, 198 Ct. Cl. at 914-15.

Plaintiff also waived his unlawful command influence claims by not raising before the Field of Inquiry, in plaintiff's letter of appeal to the GOSCA, or in plaintiff's appellate brief to the Board of Review plaintiff's allegations regarding Major Frick's email messages to plaintiff or Colonel Pick's appointment of the members of the Field Board of Inquiry. See (N G) v. United States, 94 Fed. Cl. 375, 388 (2010) (stating that a service member's failure to raise a command influence claim before an administrative discharge board was "fatal" to the service member's claim and precluded the court from considering the service member's command influence claim); see also Klingenschmitt v. United States, 119 Fed. Cl. at 190 (finding that the service member's "other objections based on allegedly improper command influence were not raised [before the plaintiff's court-martial] and are therefore waived" (citing Martinez v. United States, 914 F.2d 1486, 1488 (Fed. Cir. 1990))); Spehr v. United States, 51 Fed. Cl. 69, 87-88 (2001) (concluding that a service member waived his command influence allegation by not raising his allegation in his administrative discharge proceedings or in his petition to a board for correction of military records), aff'd, 49 F. App'x 303 (Fed. Cir. 2002). At the Field Board of Inquiry hearing, the President of the Field Board of Inquiry informed plaintiff that Colonel Pick had appointed the Board Members and informed plaintiff of his "right to challenge for cause any members of the board." Plaintiff, however, indicated that he "ha[d] no challenges" to the Board

---

[22] "The record of proceedings [before a Field Board of Inquiry] will be kept in summarized form unless a verbatim record is required by the appointing authority after consultation with the servicing judge advocate or legal advisor concerning the availability of verbatim reporters." AR 600-8-24, ¶ 4-15(c)(1). Nothing in the administrative record indicates that plaintiff requested that the Army maintain a verbatim transcript of plaintiff's proceedings before the Field Board of Inquiry or that the Army determined a verbatim transcript was required.

Members. Although the President of the Field Board of Inquiry stated that "the records in this case disclose no grounds for challenging any member for cause. There are no reasons why any members would not be able to hear the evidence submitted by the respondent and make a fair and impartial determination in the case," plaintiff could have objected nonetheless. In this case, plaintiff's failure to challenge a Board Member for cause waived his right to subsequently challenge the alleged impartiality of a Member of the Board in this court. See Frecht v. United States, 25 Cl. Ct. at 131 n.7 (concluding that a service member waived his right to challenge "Col. Keaveney's participation in the BOI proceedings" when the service member's "concerning Col. Keaveney was not raised or argued before the BOI"). Plaintiff also waived his unlawful command influence argument concerning Major Frick's email messages to plaintiff by failing to raise the issue during his elimination proceeding. See (N G) v. United States, 94 Fed. Cl. at 388.

Regarding plaintiff's arguments that the notice of an additional, third basis for elimination involving the revocation of plaintiff's security clearance was "facially defective" and that "[t]he record does not show that Exnicios lost his Secret clearance," plaintiff did not raise either challenge at the Field Board of Inquiry, in plaintiff's letter of appeal to the GOSCA, or in plaintiff's appellate brief to the Board of Review. Although plaintiff submitted evidence relevant to the revocation of his security clearance, plaintiff did not once assert that he maintained a Secret security clearance, notwithstanding the fact that Angelica Seivwright, a government witness, had testified that plaintiff's security clearance had been revoked at all levels. By failing to challenge the accuracy of the additional, third basis for elimination or argue that plaintiff maintained a Secret security clearance at the Field Board of Inquiry, in his letter of appeal to the GOSCA, or in his appellate brief to the Board of Review, plaintiff deprived the Army of an opportunity to address the merits of plaintiff's arguments, and thereby waived his ability to raise those arguments for the first time in this court. See Rock v. United States, 112 Fed. Cl. 113, 126-28 (2013) (concluding that a serviceman waived his claims that a Physical Evaluation Board (PEB) used the wrong standard of review and disability schedule and failed to consider evidence when the serviceman did not raise his claims in his petition for relief from the PEB's determination).

Additionally, nothing in the summarized transcript of plaintiff's proceedings before the Field Board of Inquiry indicates that plaintiff raised any specific due process claims before the Field Board of Inquiry, in plaintiff's letter of appeal to the GOSCA, or in plaintiff's appellate brief to the Board of Review. As discussed above, plaintiff argues that he did not receive due process because plaintiff "was not provided with adequate notice of what he was being charged with" and plaintiff was not permitted to confront the Polygraph Examiner or the individual that provided the anonymous tip to DIA regarding plaintiff's alleged unreported foreign contacts. Plaintiff, however, did not raise those due process claims before the Field Board of Inquiry, in plaintiff's letter of appeal to the GOSCA, or in plaintiff's appellate brief to the Board of Review. By failing to assert a due process argument related to the allegations described above during his elimination proceedings, plaintiff deprived the Army of the opportunity to consider plaintiff's due process arguments, and, consequently, plaintiff's failure to raise his due process arguments waives his right to subsequent review in this court. See Frecht v. United States, 25 Cl. Ct. at 131 n.7; see also Snakenberg v. United States, 15 Cl. Ct. at 811.

Regarding plaintiff's argument that the GOMOR was "factually and facially defective" and should not have been presented to the BOI, based on the record before the court, plaintiff did not object to the admission of the GOMOR into the evidence before the Field Board of Inquiry during his proceeding at the Field Board of Inquiry, in plaintiff's letter of appeal to the GOSCA, or in plaintiff's appellate brief to the Board of Review. By failing to object to the admission of the GOMOR, plaintiff waived his argument that the Field Board of Inquiry improperly considered the GOMOR. See Snakenberg v. United States, 15 Cl. Ct. at 811; see also Waller v. United States, 198 Ct. Cl. at 914-15. Plaintiff, however, did at least briefly argue in his letter of appeal to the GOSCA that "the GOMOR was factually inaccurate" and in plaintiff's appellate brief to the Board of Review that "[r]ecent information shows that the GOMOR I was issued was flawed procedurally and in its substance." Therefore, plaintiff's claim in his motion for judgment on the administrative record that the "record demonstrates conclusively that the GOMOR was inaccurate" was raised during plaintiff's elimination proceeding and, therefore, arguably has not been waived. Thus, after analyzing defendant's arguments regarding justiciability and waiver, plaintiff's only claims that should not be dismissed for failure to state a claim is plaintiff's argument that the recommendation of the Field Board of Inquiry, recommendation of the Board of Review, and decision of the Deputy Assistant Secretary were not supported by substantial evidence and that the GOMOR was factually inaccurate.[23]

In the alternative to defendant's motion to dismiss, the parties have crossed-moved for judgment on the administrative record regarding the recommendation of the Field Board of Inquiry, recommendation of the Board of Review, and decision of the Deputy Assistant Secretary. Pursuant to RCFC 52.1(c), which governs motions for judgment on the administrative record, the court's inquiry is directed to "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005))); see also Martin v. United States, 133 Fed. Cl. 248, 253 (2017) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006)); Vellanti v. United States, 119 Fed. Cl. 570, 578 (2015) (quoting Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 751 (2012)) ("RCFC 52.1 governs motions for judgment on the administrative record. . . . Unlike summary judgment, for instance, 'a genuine dispute of material fact does not preclude a judgment on the administrative record.'").

Plaintiff contends that the approval of the Board of Review's recommendation to eliminate plaintiff by the Deputy Assistant Secretary was arbitrary and capricious and not

---

[23] In plaintiff's complaint, plaintiff alleges that the decision to discharge plaintiff from the Army was arbitrary and capricious and "was subject to unlawful command influence," but plaintiff does not assert in his complaint that the Field Board of Inquiry improperly considered the Polygraph Examiner's Report, that the additional, third basis regarding the revocation of plaintiff's security clearance was "facially defective" and that plaintiff retained a security clearance, that the Army did not provide plaintiff with due process, or that the GOMOR was inaccurate and "should not have been presented to the BOI."

supported by substantial evidence. "[T]he court may only 'review the rationale underlying the Secretary's decision to determine if the decision was arbitrary, capricious, unsupported by substantial evidence, or in violation of law.'" Cook v. United States, 123 Fed. Cl. 277, 306-07 (2015) (quoting Strickland v. United States, 423 F.3d 1335, 1339 (Fed. Cir. 2005)); see also West v. United States, 103 Fed. Cl. 55, 60 (2012) (analyzing a service member's claim that the Secretary of the Army wrongfully discharged the service member and stating "the court asks whether the party seeking relief has shown that the contested decision was arbitrary and capricious, contrary to law, or unsupported by substantial evidence"); Boyd v. United States, 207 Ct. Cl. 1, 8-9 (1975) ("The court, in turn, may reject the decision of a Secretary only if he has exercised his discretion arbitrarily, capriciously, in bad faith, contrary to substantial evidence, or where he has gone outside the board record, or fails to explain his actions, or violates applicable law or regulations."). This standard of review is narrow. The court, however, does not sit as "a super correction board." Skinner v. United States, 219 Ct. Cl. at 331, 594 F.2d at 830; see also Voge v. United States, 844 F.2d 776, 782 (Fed. Cir.) (The "court does not function as 'a sort of super Correction Board.'" (quoting Reale v. United States, 208 Ct. Cl. 1010, 1013, 529 F.2d 533, cert. denied, 429 U.S. 854 (1976))), cert. denied, 488 U.S. 941 (1988); Ward v. United States, 133 Fed. Cl. 418, 427 (2017) (quoting Stine v. United States, 92 Fed. Cl. 776, 791 (2010)). Moreover, "military administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs." Dodson v. United States, 988 F.2d at 1204; see also Pipes v. United States, 134 Fed. Cl. 380, 390 (2017) (quoting Porter v. United States, 163 F.3d at 1316). "'[J]udges are not given the task of running the Army.'" Antonellis v. United States, 723 F.3d 1328, 1332 (Fed. Cir. 2013) (quoting Orloff v. Willoughby, 345 U.S. at 93); see also Lippman v. United States, 127 Fed. Cl. at 244 (citation omitted). The United States Supreme Court, however, also has stated:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) [reh'g denied and reh'g denied sub nom. SEC v. Fed. Water & Gas Corp. (1947)]. We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc., 419 U.S. [281,] 286, 95 S. Ct. 438, 42 L. Ed. 2d 447 [(1974)]. See also Camp v. Pitts, 411 U.S. 138, 142–143, 93 S. Ct. 1241, 36 L. Ed. 2d 106 (1973) (per curiam).

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43-44 (1983) (other citations omitted); see also SKF USA Inc. v. United States, 630 F.3d 1365, 1373 n.3 (Fed. Cir. 2011)).

**Decisions of the Field Board of Inquiry, Board of Review, and Deputy Assistant Secretary**

Plaintiff alleges the actions of the Field Board of Inquiry, Board of Review, and Deputy Assistant Secretary were arbitrary and capricious because: 1) plaintiff could have been transferred to a field artillery position; 2) plaintiff was prematurely terminated before he could reapply for his security clearance; 3) there was evidence that plaintiff had "recovered from any lapse of judgment and was rehabilitated;" and 4) the third basis, regarding the revocation of plaintiff's security clearance, allegedly supporting elimination was facially deficient. Plaintiff asserts that he should have been retained by the Army because plaintiff "was a top artilleryman," was only required to maintain a Secret security clearance for an artillery position, and the Members of the Field Board of Inquiry "seemed to base their decision on whether Exnicios should be eliminated as an FAO and not whether he should be eliminated from the Army." Plaintiff argues that the Field Board of Inquiry only spent "8.78 seconds on each sheet of paper" and the Board of Review only spent "an average of 2.4 seconds on each page" when reviewing the record before each Board, which, according to plaintiff, is "clear evidence that neither board considered all relevant factors." Plaintiff also contends the Boards and Deputy Assistant Secretary failed to articulate rational explanations connected to the facts. Additionally, plaintiff asserts that the decision to eliminate plaintiff before he was eligible to reapply for his security clearance was arbitrary and capricious, and the "fact that the DOHA AJ [administrative judge] felt that the clearance should have been restored should have weighed heavily on both the BOI and the BOR [Board of Review]." Plaintiff also asserts that the "record is rife with praise for his performance both before and after the incidents." Regarding the third basis for elimination identified in the July 15, 2013 memorandum for "substandard performance of duty, due to the permanent revocation of your security clearance," plaintiff argues that the third basis is facially deficient because the notice incorrectly cited to AR 600-8-24, paragraph 4-2(a)(10), which states that elimination proceedings will be initiated when an officer consecutively fails APFTs, rather than AR 600-8-24, paragraph 4-2(b)(10), which states that elimination proceedings may be initiated against an officer after the "final denial or revocation of an officer's Secret security clearance." According to plaintiff, the administrative record "does not show that Exnicios lost his Secret clearance," and "even the presumed correct citation does not cover the loss of a TS (SCI) clearance."

Defendant, however, argues that the Deputy Assistant Secretary's approval of "the unanimous board of review recommendation that Mr. Exnicios should be eliminated is the antithesis of an arbitrary and capricious decision." Defendant states that "by the time the elimination proceedings reached the Secretary, each of the following had recommended that Mr. Exnicios be eliminated from the Army: a unanimous board of inquiry, a GOSCA, and a unanimous board of review." Defendant also argues that the Deputy Assistant Secretary appropriately gave the administrative judge's decision "very little weight when determining whether Mr. Exnicios should be eliminated" because the administrative judge's decision "addressed a different issue—Mr. Exnicios's security clearance—than the issue before the Secretary—whether Mr. Exnicios should be involuntarily discharged." Defendant contends that the United States Army Personnel Security Appeals Board "rejected" the DOHA administrative judge's reasoning "by overruling the AJ's [DOHA administrative judge's] decision" and argues that the United States Army Personnel

Security Appeals Board's rejection "should preclude" the court from finding that the Deputy Assistant Secretary should have given any probative weight to the DOHA administrative judge's decision. Additionally, defendant asserts that there was substantial evidence before the Field Board of Inquiry supporting the Field Board of Inquiry's conclusion that, at the time plaintiff initially was in contact with Yuliya, he thought, or was not sure, she was a Ukrainian citizen, and there was evidence in the record that plaintiff did not possess a security clearance.

The Field Board of Inquiry

The Field Board of Inquiry convened on March 7, 2014 to determine whether plaintiff "should be eliminated from the Army prior to the expiration of the Soldier's current term of service, under the provisions of AR 600-8-24, paragraph 4-2, for misconduct, moral or professional dereliction and for substandard performance of duty." The Field Board of Inquiry found in full:

FINDINGS

The board, having carefully considered the evidence before it, finds:

The allegation of misconduct under AR 600-8-24, paragraph 4-2b, specifically that substantiated derogatory activity resulted in a General of Memorandum of Reprimand dated 2 April 2012, being file [sic] in your Official Military Personnel File, is supported by a preponderance of the evidence and does warrant elimination.

The allegation of misconduct under AR 600-8-24, paragraph 4-2b, specifically you engaged in conduct unbecoming an officer as related to the above referenced event, in the notification of proposed separation, is supported by a preponderance of the evidence and does warrant elimination.

The allegation of substandard performance of duty under AR 600-8-24, paragraph 4-2a, specifically, that action has been taken, and your final appeal of that action denied, by appropriate authorities to permanently revoke your security clearance, in the notification of proposed separation, is supported by a preponderance of the evidence and does warrant elimination.

RECOMMENDATION

In view of the above findings, the board recommends that MAJ Adam L. Exnicios, be:

Eliminated from the United States Army with a general (under honorable conditions) characterization of service.

(capitalization in original).

The First and Second Bases for Elimination

Regarding the Field Board of Inquiry's first two bases for elimination, the allegation of misconduct "that substantiated derogatory activity" resulted in a GOMOR being filed in plaintiff's official military personnel file and that plaintiff "engaged in conduct unbecoming an officer as related to the" GOMOR, the Field Board of Inquiry received the GOMOR and the filing determination placing the GOMOR in plaintiff's official military personnel file as exhibits. The GOMOR stated that plaintiff had "failed to inform the investigating agent about your close, personal relationships with two separate foreign national women, neither of which are your wife." The GOMOR also noted that plaintiff had maintained contact with Yuliya through social media and indicated that plaintiff's failure to notify the "appropriate servicing security office" raised questions about plaintiff's reliability, trustworthiness, and ability to safeguard classified information.

The Field Board of Inquiry also received the DIA Agent's Report regarding plaintiff's January 10, 2012 interview and the January 12, 2012 polygraph examination, plaintiff's Voluntary Sworn Statement, plaintiff's Unofficial Foreign Contact Report, and the DIA Polygraph Examiner's Report. The DIA Agent's Report dated January 17, 2012 detailed plaintiff's interactions with the two women plaintiff seemed to believe were Ukrainian, only one of whom plaintiff alleges to be a naturalized United States citizen, which plaintiff had not reported during his original interview with DIA in June 7, 2011. Regarding Yuliya, the Ukrainian woman plaintiff met at Columbia University, who plaintiff alleges to be a naturalized United States citizen, but who was from Ukraine and identified by plaintiff as Ukrainian during his January 2012 interviews, the DIA Agent's Report dated January 17, 2012 indicated that plaintiff stated during the January 10, 2012 interview that plaintiff and Yuliya "had a long dinner and many drinks" and "shared personal conversation." In plaintiff's Unofficial Foreign Contact Report regarding Yuliya, plaintiff stated that their relationship "was continuous as of spring 2011 – could continue in future." The DIA Agent also testified before the Field Board of Inquiry that, during plaintiff's January 10, 2012 interview, plaintiff "documented" Yuliya as a Ukrainian citizen, not as a United States citizen, and stated that "[c]ontinuing contact is two occasion [sic] and maintaining that contact; it is ongoing, such as emailing or face booking."

Regarding Okasana, the Ukrainian woman plaintiff met while in Germany in 2008, the DIA's Agent's Report dated January 17, 2012 provided that plaintiff stated during his January 10, 2012 interview that he had a "crush" on Okasana and had developed a "strong emotional bond with HER." (capitalization in original). Additionally, plaintiff indicated in his January 10, 2012 interview that, "[w]hile in Washington, DC, SUBJECT admitted that he and [Okasana] separated from the group to go on a shopping trip. On a shopping trip to Tyson's Corner Mall in Virginia, [Okasana] tried on dresses and other clothes and modeled them for SUBJECT." (capitalization in original). Plaintiff "denied any intimate contact with [Okasana] on the trip to Washington, DC" during his January 10, 2012 interview, but stated that he and Okasana subsequently kissed at a seminar function at the Community Club in Germany, while plaintiff's wife was sick and unable to attend. Plaintiff "advised that HE did not report HIS contact with [Okasana] during HIS security

interview with the DAC-4 Investigations Division in Jun 2011 because HE wanted to 'disassociate' HIMSELF from the situation. HE did not want it to affect HIS job and HIS family." (capitalization in original). In his Voluntary Sworn Statement provided by plaintiff on January 10, 2012, plaintiff stated that he had "close contact with [Okasana] a Ukrainian between September to November of 2008" and their contact "became at first professionally and then personally close, at times the behavior was both provacitive [sic] and flirtatious."

Additionally, the DIA Agent's Report indicated that, in plaintiff's January 12, 2012 polygraph examination, plaintiff provided "the polygraph examiner with additional details regarding the TDY to Washington, DC in Nov 2008 which HE did not provide to Reporting Agent during HIS interview on 10 Jan 2012 and did not report on HIS Voluntary Sworn Statement which he completed on 10 Jan 2012." (capitalization in original). Although plaintiff had "denied any intimate contact with [Okasana] on the trip to Washington, DC" during his January 10, 2012 interview, plaintiff indicated during the January 12, 2012 polygraph examination that Okasana "modeled clothing for HIM in a provocative manner," and that he and Okasana had kissed at the dinner they went to while on the trip to Washington, D.C., as well as during the cab ride back to their hotel following that dinner. (capitalization in original). Plaintiff "admitted that HE was trying to keep the relationship secret from HIS classmates and instructors. SUBJECT learned how HE was potentially vulnerable and exploitable." (capitalization in original). Additionally, the Polygraph Examiner's Report stated that plaintiff "did not complete" the specific issue polygraph examination regarding sexual intercourse with Ukrainian women since plaintiff had been married, and the Polygraph Examiner's Report stated that "Deception was Indicated." (capitalization in original).

As discussed above, the Field Board of Inquiry "makes findings on each reason for separation and recommends whether a respondent should be retained in military service. . . . The Board of Inquiry's findings must be supported by a preponderance of the evidence." Dep't of Def. Instruction 1332.30, Encl. 3 ¶ 3(c); see also AR 600-8-24, ¶ 4-15(b)(2) ("The [Field] Board [of Inquiry] will render findings of fact, supported by a preponderance of the evidence, that describe specific relevant conduct by the Respondent in sufficient detail to support the Board's recommendation."). Given the evidence before the Field Board of Inquiry, it was not arbitrary and capricious for the Board to conclude that the government had established, by a preponderance of the evidence, that plaintiff had engaged in misconduct that resulted in the GOMOR being placed in his official military personnel file and in conduct unbecoming of an officer as indicated in the GOMOR. See United States v. C.H. Robinson Co., 760 F.3d 1376, 1383 (Fed. Cir. 2014) ("'Preponderance of the evidence' means ""the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it.""" (quoting St. Paul Fire & Marine Ins. Co. v. United States, 6 F.3d 763, 769 (Fed. Cir. 1993) (quoting Hale v. Dep't of Transp., Fed. Aviation Admin., 772 F.2d 882, 885 (Fed. Cir. 1985)))). Plaintiff failed to disclose his contacts and relationships with the two women from the Ukraine, and, even when plaintiff disclosed the two foreign contacts, plaintiff failed to disclose all of the relevant details involving Okasana during his January 10, 2012 interview. Plaintiff did describe his relationship with Yuliya, who plaintiff identified as a Ukrainian citizen, as "continuous" in the Unofficial Foreign Contact Report

and stated that he had "close contact" with Okasana in his Voluntary Sworn Statement. Plaintiff also indicated he attempted to keep his relationship with Okasana "secret" from his classmates and instructors, and that plaintiff did not report his contact with Okasana during his "security interview with the DAC-4 Investigations Division in Jun 2011" because he wanted to "'disassociate' HIMSELF from the situation" and "did not want it to affect HIS job and HIS family." (capitalization in original).

Moreover, the court is not persuaded by plaintiff's argument that the two email messages allegedly written by Yuliya, in which Yuliya claims to be a naturalized United States citizen, "demonstrates conclusively that the GOMOR was inaccurate" and that her Ukrainian status "should not have been used as a basis for elimination." The GOMOR did state that plaintiff "failed to inform the investigating agent about your close, personal relationships with two separate foreign national women, neither of which are your wife," and the GOMOR asserted that plaintiff's "failure to notify the appropriate servicing security office of close, intimate, or continuous communication or connection with a foreign national can raise questions about your reliability, trustworthiness and ability to protect classified information." It is undisputed that Okasana, who, in his Voluntary Sworn Statement, plaintiff stated he had "close contact" with, was a foreign national that plaintiff did not disclose during his June 7, 2011 interview with DIA. The GOMOR also stated that plaintiff had "failed to follow Army Regulations and failed to be forthcoming in relationships that directly impact your ability to continue to serve in your current capacity" as a Foreign Area Officer who was pending assignment to Russia. The DIA Agent's Report, the Polygraph Examiner's Report, plaintiff's Unofficial Foreign Contact Report, and plaintiff's Voluntary Sworn Statement all supported by a preponderance of the evidence the first two bases for elimination of plaintiff from the Army, namely that plaintiff engaged in misconduct resulting in the GOMOR being placed in his official military personnel file and in conduct unbecoming of an officer.

<u>The Third Basis for Elimination</u>

As noted above, plaintiff argues that the third basis for elimination regarding the revocation of plaintiff's security clearance is facially deficient because the notice of elimination cited to the wrong provision in AR 600-8-24, and that the administrative record "does not show that Exnicios lost his Secret clearance." The notice of plaintiff's additional, third basis for elimination provides that an "additional basis for elimination has arisen under Army Regulation (AR) 600-8-24, paragraph 4-2 (a)(10), substandard performance of duty. You are hereby notified to show cause for retention on active duty under AR 600-8-24, paragraph 4-2(a)(10) substandard performance of duty, due to the permanent revocation of your security clearance." Plaintiff correctly notes the Army cited an inapplicable section in the Army Regulations, AR 600-8-24, paragraph 4-2(a)(10), which indicates that the initiation of elimination proceedings for substandard performance of duty is appropriate "[w]hen no medical problems exist, and an officer has two consecutive failures of the APFT." Revocation of plaintiff's SCI security clearance and access eligibility, which was at issue, was not impacted plaintiff's ability, or inability, to pass the APFT. None of the evidence submitted by plaintiff or the government to the Field Board of Inquiry, however, involved plaintiff's ability to pass the APFT, and plaintiff did not address his ability to pass the APFT in his letter of appeal to the GOSCA or in his appellate

brief to the Board of Review. Rather, both plaintiff and the government submitted considerable evidence related to the status of plaintiff's security clearance. Although AR 600-8-24, paragraph 4-2, does state that the reasons for elimination articulated in AR 600-8-24, paragraph 4-2, are "not all inclusive," and that elimination may be initiated when "when one of the following or similar conditions exist," this does not appear to cure the apparent citation error. The notice of plaintiff's third basis for elimination, however, explicitly informed plaintiff that he was being considered for elimination for substandard performance of duty "due to the permanent revocation of your security clearance," and the Field Board of Inquiry found that a preponderance of the evidence supported the "allegation of substandard performance of duty under AR 600-8-24, paragraph 4-2a, specifically, that action has been taken, and your final appeal of that action denied, by appropriate authorities to permanently revoke your security clearance." The issues before the Field Board of Inquiry, therefore, was whether plaintiff's security clearance had been revoked, and whether such a revocation constituted substandard performance of duty.

Although the Army is bound by its own regulations, "strict compliance with procedural requirements is not required where the error is deemed harmless." Wagner v. United States, 365 F.3d 1358, 1361 (Fed. Cir. 2004) (citing Gratehouse v. United States, 206 Ct. Cl. 288, 512 F.2d 1104, 1108 (1975)); see also Dolan v. United States, 91 Fed. Cl. at 123 ("While government agencies must follow their own regulations, Wagner reaffirmed the concept that strict compliance with procedural requirements is not necessary when divergence from procedure is deemed harmless." (citing Wagner v. United States, 365 F.3d at 1361)). "[T]he military's failure to comply with its procedures for effecting a discharge does not render the discharge itself unlawful where the procedural error is deemed 'harmless' because the regulatory violation did not substantially affect the outcome of the matter." Rogers v. United States, 124 Fed. Cl. 757, 767 (2016); see also Dolan v. United States, 91 Fed. Cl. at 123 ("[N]o changes will be made when the error or injustice is deemed harmless because harmless errors are not sufficiently significant to change the outcome of a case." (citations omitted)). In the above-captioned case, AR 600-8-24 required that the Army officer initiating plaintiff's elimination action inform plaintiff, "in writing, that elimination action has been initiated and that he or she is required to show cause for retention" and notify plaintiff "of the reasons supporting the elimination action and the factual allegations supporting the reasons." See AR 600-8-24, Table 4-1. The citation in plaintiff's notice to a subsection of AR 600-8-24, paragraph 4-2, regarding the APFT was harmless error because the notice stated that plaintiff was being considered for elimination for substandard performance of duty "due to the permanent revocation of your security clearance," and plaintiff's elimination proceedings concerned the revocation of plaintiff's security clearance, not plaintiff's ability to pass the APFT. Moreover, as discussed above, plaintiff never asserted during his elimination proceedings that the notice of the additional, third basis for elimination did not adequately provide plaintiff with notice of why the Army was initiating elimination proceedings and plaintiff submitted evidence relating to his security clearance, which indicates that plaintiff was aware of the reasons why the Army initiated and completed elimination proceedings.

Furthermore, despite the inapplicable citation in the notice of plaintiff's additional, third basis for elimination, the decision of the Field Board of Inquiry and the evidence received into the record fully documents the basis for the Field Board of Inquiry's decision.

The Field Board of Inquiry received as evidence the United States Army Personnel Security Appeals Board's June 26, 2013 memorandum to plaintiff, which had a subject line of "Appeal of Security Clearance Revocation and Sensitive Compartmented Information (SCI) Access Ineligibility." In the June 26, 2013 memorandum, the United States Army Personnel Security Appeals Board stated that it had denied plaintiff's appeal "based upon your failure to mitigate the following concerns addressed by the U.S. Army Central Personnel Security Clearance Facility (CCF): Personal Conduct and Foreign Influence." The June 26, 2013 memorandum stated "[t]his decision is final and completes your due process. In accordance with paragraph 8-201, AR 380-67, a request for reconsideration of your case may be resubmitted one year from the date of this letter." The plain language of the June 26, 2013 memorandum in the record indicates that plaintiff's security clearance was being revoked, and that, in addition, plaintiff was ineligible to access Sensitive Compartmented Information.

Additionally, several witnesses who appeared before the Field Board of Inquiry testified that plaintiff did not possess any level of a security clearance. The second government witness, Angelica Seivwright, who stated that "[m]y office manages background investigations and security clearances," testified that, "[a]s of today's date, his [plaintiff's] security clearance is revoked," and that plaintiff's "security clearance was revocated [sic] at all levels; he currently does not have any level of clearance." Ms. Seivwright also stated, "[b]ecause MAJ Exnicios does not have clearance, I can't initiate a re-investigation. My hands are tied because his clearance is revoked, unless we are at that one year mark for reconsideration, then we can initiate it at that time." Additionally, plaintiff called as a witness LTC Ross V. Gagliano, who stated that he was plaintiff's "supervisor and have been for 11 months." LTC Gagliano stated that "[w]e had a challenge to place him [plaintiff] because he doesn't have a security clearance," and that "it was determine[d] his clearance was permanently revoked." Two additional witnesses called by plaintiff, plaintiff's father and plaintiff's wife, both testified that plaintiff had lost his security clearance.

The United States Army Personnel Security Appeals Board's June 26, 2013 memorandum and the testimony provided by the witnesses before the Field Board of Inquiry supports, by a preponderance of the evidence, the Field Board of Inquiry's finding of substandard performance of duty because "action has been taken, and your final appeal of that action denied, by appropriate authorities to permanently revoke your security clearance . . . and does warrant elimination." The United States Army Personnel Security Appeals Board's June 26, 2013 memorandum indicated that it denied plaintiff's appeal of his security clearance revocation and Sensitive Compartmented Information access ineligibility, and the testimony before the Field Board of Inquiry indicated that plaintiff did not possess a security clearance. Nothing in the record before the Field Board of Inquiry indicates that plaintiff had maintained any level of security clearance, and nowhere in plaintiff's testimony before the Field Board of Inquiry or in his appellate brief to the Board of Review does plaintiff claim to have maintained any level of security clearance. As an officer in the United States Army, plaintiff was required to "hold a security clearance of at least secret." See AR 600-8-24, ¶ 4-1(b). The evidence before the Field Board of Inquiry indicated plaintiff did not maintain any level of security clearance, and at the time indicated that plaintiff's security clearance had been revoked. Therefore, the

Field Board of Inquiry rationally concluded that plaintiff's lack of security clearance constituted substandard performance of duty and warranted elimination.

Additionally, the Field Board of Inquiry did not act "prematurely" by recommending elimination of plaintiff before plaintiff could reapply for his security clearance and Sensitive Compartmented Information access eligibility, as plaintiff alleges. Moreover, nothing in AR 600-8-24, which governs elimination proceedings of Army officers, required that the Field Board of Inquiry stay elimination proceedings until plaintiff could reapply for his security clearance and Sensitive Compartmented Information access eligibility in June 2014, nor was there any persuasive evidence in the record before the Field Board of Inquiry that plaintiff would receive a security clearance when he reapplied. Rather, AR 600-8-24, paragraph 4-2, states that elimination proceedings "may be or will be initiated" "when one of the following or similar conditions exist." The Field Board of Inquiry, therefore, did not act arbitrarily and capriciously when it concluded that plaintiff's third basis for elimination was supported by a preponderance of the evidence and warranted elimination.

Contrary to plaintiff's position, for the reasons articulated above regarding all three bases supporting elimination, "all evidence" did not point to retention of plaintiff as a Field Artillery Officer, and the administrative record does provide a basis to conclude whether "the Plaintiff had recovered from any lapse of judgment and was rehabilitated," as alleged by plaintiff. The Field Board of Inquiry did hear testimony from two witnesses called by plaintiff who generally stated that plaintiff should be retained by the Army and from eight witnesses called by plaintiff, including plaintiff, who alleged that plaintiff was a valuable asset to the Army. The Field Board of Inquiry also received the Officer Evaluation Reports in plaintiff's official military personnel file, which had rated plaintiff's performance as outstanding. Elimination of an officer from the Army, however, may occur when one of the conditions in AR 600-8-24, paragraph 4-2, are present or a similar condition exists. See AR 600-8-24, ¶ 4-2. The Field Board of Inquiry was required to "describe specific relevant conduct . . . in sufficient detail to support the Board's recommendation" for each basis supporting elimination and had the option of "recommend[ing] retention (with or without reassignment) or involuntary separation." AR 600-8-24, ¶ 4-2(b)(2); see also Dep't of Def. Instruction 1332.30, Encl. 3 ¶ 3(c)(2). The Field Board of Inquiry "may choose to address mitigating, extenuating or aggravating factors in its findings where the Board believes that such findings are necessary to support or explain the Board's recommendation." Id. ¶ 4-15(b)(2). In the above-captioned case, the Field Board of Inquiry found that there were three bases supporting the elimination of plaintiff from the Army – one basis under AR 600-8-24, paragraph 4-2(a), "[s]ubstandard performance of duty," and two bases under AR 600-8-24, paragraph 4-2(b), "[m]isconduct, moral or professional dereliction, or in the interests of national security." Because each of the three bases for elimination was supported by a preponderance of the evidence, it was within the discretion of the Field Board of Inquiry to recommend elimination or retention of plaintiff. The evidence of plaintiff's service in the Army did not preclude the Field Board of Inquiry from rationally recommending that plaintiff should be eliminated from the Army, given plaintiff's substandard performance of duty and misconduct, nor did the evidence of plaintiff's service in the Army require the Field Board of Inquiry to address alleged mitigating circumstances under AR 600-8-24, paragraph 4-15(b)(2). The incorrect citation in

plaintiff's notice of the additional, third basis for elimination cannot overcome the fully developed record supporting the propriety of plaintiff's elimination process, despite previous good military service.

Finally, plaintiff argues that the decision of the Field Board of Inquiry was arbitrary and capricious because the Field Board of Inquiry only spent "8.78 seconds on each sheet of paper." According to plaintiff:

> The BOI convened at 9 am and closed for deliberations at 1:30 pm. They heard from eleven witnesses and were presented with 205 pages of documents including Exnicios military record. The board deliberated for only 30 minutes, reconvening at 2:00 pm. Assuming no time for discussions, review of witness testimony completion of the forms and time required for everyone to reassemble, the members spent an average of 8.78 seconds on each sheet of paper.

(internal references omitted). When the President of the Field Board of Inquiry convened the Field Board of Inquiry, the President stated that "the records in this case disclose no grounds for challenging any member [of the Field Board of Inquiry] for cause" and "inquired if any member desires a recess further study or review any matters. No members desired to recess," and plaintiff did not challenge any member of the Field Board of Inquiry for cause, suggesting the expectation was that all parties and Board Members should have reviewed and studied "the records in this case." The Field Board of Inquiry then held the hearing regarding plaintiff's elimination for four and a half hours, during which the Field Board of Inquiry heard the testimony of eleven witnesses. Moreover, in plaintiff's March 30, 2014 appellate brief to the Board of Review, plaintiff noted that "they [the Field Board of Inquiry] had the documentation provided by the government to review for several months." Contrary to plaintiff's assertion, there is no evidence in the record before the court that indicates the Members of Field Board of Inquiry failed to consider evidence relevant to plaintiff's elimination, or did not review the records that had been made available to them several months before the hearing.

<u>The Board of Review and the Deputy Assistant Secretary</u>

Subsequent to plaintiff's hearing before the Field Board of Inquiry, on July 10, 2014, a Board of Review "convened to review the action of the Board of Inquiry which recommended elimination" of plaintiff from the Army.[24] The Recorder of the Board of

---

[24] Prior to the convening of the Board of Review, on March 30, 2014, plaintiff submitted a letter of appeal to Colonel Pick, who was serving as the GOSCA, in which plaintiff requested that Colonel Pick "thoroughly review the results of the Board of Inquiry both in regard to the recommendation to eliminate me from the Army before being allowed to request reconsideration of my security clearance in June of 2014, and in regard to the character of discharge recommended." On April 4, 2014, Colonel Pick recommended approval of the Field Board of Inquiry's recommendation of elimination, but recommended that plaintiff's discharge be characterized as honorable rather than general, as recommended by the Field Board of Inquiry.

Review stated the GOMOR in plaintiff's file reflects that plaintiff failed to inform the Agent investigating his security clearance "of his close personal relationships with two separate foreign national women, neither of whom was his wife. He also failed to inform his wife of these relationships and continued to maintain the connections through social media and to communicate his professional travel arrangements." According to the Recorder, plaintiff's "failure to notify the appropriate servicing security office of these contacts raised questions about his reliability, trustworthiness, and ability to protect classified information." The Recorder of the Board of Review also noted that plaintiff's elimination action had been supplemented with grounds for elimination "based on AR 600-8-24, paragraph 4-2(a)(10) due to substandard performance of duty due to the permanent revocation of Major Exnicios' security clearance." Additionally, the Recorder of the Board of Review discussed plaintiff's proceedings before the Field Board of Inquiry, plaintiffs' educational background, plaintiff's years of service in the Army, and the medals plaintiff was authorized to wear. The Recorder also asked, "[h]as each member now present examined the Proceedings of the Board of Inquiry prior to the convening of this Board?" The recorder then stated "[l]et the record reflect each member has indicated in the affirmative. I now submit for consideration of this Board the report of the proceedings of the Board of Inquiry," which included "all items offered (*whether or not received*) or considered as evidence," a written copy of the testimony of each witness, and a copy of the Field Board of Inquiry's findings. (emphasis in original).

The Board of Review then closed its hearing, and its members deliberated, for approximately ten minutes, in private. When the Board of Review reconvened, the President of the Board of Review stated that the Board of Review, "having reviewed the records of this case," found:

The Government has established by a preponderance of the evidence that:

- The allegation of misconduct under AR 600-8-24, paragraph 4-2b, specifically that substantiated derogatory activity resulted in a General Officer Memorandum of Reprimand, dated 2 April 2012, being filed in Major Exnicios' Official Military Personnel File is supported;

- The allegation of misconduct under AR 600-8-24, paragraph 4-2b, specifically that Major Exnicios engaged in conduct unbecoming an officer as related to the above referenced event, in the notification of proposed separation, is supported; and

- The allegation of substandard performance of duty under AR 600-8-24, paragraph 4-2a, specifically, that action has been taken and his final appeal of that action denied by appropriate authorities to permanently revoke his security clearance, in the notification of proposed separation is supported.

Based on its proceedings and the record before it, the Board of Review recommended that plaintiff be "eliminated from the United States Army with an Honorable characterization of service."

The record before the Board of Review included the "original record of the BOI proceedings and the officer's submissions and elections." The Members of the Board of Review all indicated that, prior to the convening of the Board of Review, they had examined the Report of Proceedings of the Field Board of Inquiry. As discussed above, the evidence before the Field Board of Inquiry supported the Field Board of Inquiry's findings regarding the three bases for elimination, as well as the Field Board of Inquiry's recommendation to eliminate plaintiff from the Army. For the reasons articulated above regarding the Field Board of Inquiry's findings, the evidence before the Board of Review, which included the evidence before the Field Board of Inquiry, also supported a finding that the government had established that substantiated derogatory activity resulted in a GOMOR being placed in plaintiff's official military personnel file, plaintiff engaged in conduct unbecoming an officer as referenced in the GOMOR, and that plaintiff's security clearance had been revoked. The Board of Review was not required, as plaintiff appears to assert, to make a separate, independent, written finding as to whether plaintiff should be eliminated as a Foreign Area Officer and retained as a Field Artillery Officer. Rather, "after thorough review of the records of the case," the Board of Review is to "make recommendations to the Secretary of the Army or his designee as to whether the officer should be retained in the Army." AR 600-8-24, ¶ 4-17(a). The Board of Review had the option of recommending retention, with or without assignment, or elimination, and the Board of Review rationally recommended that plaintiff should be eliminated from the Army. See id. ¶ 4-17(c).

Additionally, plaintiff's argument that the Board of Review's recommendation was arbitrary and capricious because the Board of Review only spent "an average of 2.4 seconds on each page" when reviewing the record before it fails. Plaintiff asserts:

> The Board of Review convened at 11:14 and announced findings at 11:24. This included a three and one half page recitation by the Recorder plus time to announce their findings. Giving the BOR credit for the full ten minutes, they would have spent an average of 2.4 seconds on each page of the 250 pages in the record.

The members of the Board of Review, however, all affirmatively indicated that they had reviewed the Report of Proceedings before the Field Board of Inquiry prior to convening the Board of Review. Plaintiff has failed to put forth any evidence indicating that the Members of the Board of Review had not prepared in advance by reviewing the available records or considering their options prior to convening the Board of Review and before making a recommendation to be forwarded to the Deputy Assistant Secretary.

Regarding the actions of the Deputy Assistant Secretary, on August 4, 2014, the Army provided the Deputy Assistant Secretary with a Memorandum from the Legal Section, which stated:

MAJ Exnicios has about 16 years of AFS. In April 2012, MAJ Exnicios was issued a GOMOR for violating AR 380-67 by failing to report his close contacts with two foreign national women to his servicing security office and for not being forthcoming regarding those contacts in the course of interviews with the agent investigating his fitness to hold a security clearance. Although, MAJ Exnicios argues the women were not actually foreigners, but rather naturalized citizens of the United States, the facts and circumstances surrounding at least one of the relationships revealed that he, a married man, held hands, kissed and flirted with one of the women over dinner and was seen kissing this same woman in public on a separate occasion as witnessed by the wife of a fellow officer. HRC initiated elimination in February 2013.

The Memorandum from the Legal Section noted that the Field Board of Inquiry had recommended a general discharge, the GOSCA had recommended an honorable discharge, and the Board of Review had recommended an honorable discharge. The Legal Office then recommended that plaintiff be honorably discharged.

In the Deputy Assistant Secretary's August 6, 2014 memorandum approving elimination of plaintiff from the Army, the Deputy Assistant Secretary noted that the Field Board of Inquiry and the Board of Review had recommended that plaintiff be eliminated from the Army. The Deputy Assistant Secretary approved "the Board of Review's recommendations to involuntarily eliminate Major Exnicios from the United States Army based on both misconduct and moral or professional dereliction (Army Regulation 600-8-24, paragraph 4-2b), and substandard performance of duty (Army Regulation 600-8-24, paragraph 4-2a), with an Honorable characterization of service." Based on the available records, including the Field Board of Inquiry's recommendation of discharge, the GOSCA's recommendation of discharge, the Board of Review's recommendation of discharge, and the Legal Office's recommendation of discharge, it was not arbitrary and capricious for the Deputy Assistant Secretary to approve of the Board of Review's recommendation of plaintiff's elimination from the Army.

### **The Merits of Plaintiff's Additional Arguments**

In the alternative, the court briefly addresses the merits of plaintiff's additional arguments, in the event there is disagreement as to whether those allegations were waived. Plaintiff's additional arguments include that the Field Board of Inquiry improperly considered the GOMOR and the Polygraph Examiner's Report, plaintiff's elimination proceeding was tainted by unlawful command influence, and that plaintiff was deprived due process during his elimination proceedings. Defendant, however, argues that "[e]ach of Mr. Exnicios's arguments is either contradicted by the record or runs contrary to well-settled principles of controlling law (or both)."

### Plaintiff's Challenge to the Field Board of Inquiry's Consideration of the GOMOR

Plaintiff asserts that the GOMOR "should not have been presented to the BOI." According to plaintiff, the GOMOR was facially defective because the reference in the

GOMOR to "close relationships with two foreign national women belies the facts" and, "[a]s has been repeatedly shown, one woman [Yuliya] was a United States citizen and not subject to reporting." Plaintiff asserts his relationship with Okasana, the Ukrainian woman plaintiff met in Germany, was not a continuing relationship and that he "immediately ended any further contact." Plaintiff argues the GOMOR should not have been presented to Field Board of Inquiry and should not have been used as a basis for elimination. Defendant does not address whether the Field Board of Inquiry should have received the GOMOR as evidence, but argues that there was substantial evidence to support the Field Board of Inquiry's "conclusion that Ms. [Yuliya] was not an American citizen" when plaintiff had contact with her, which addresses the merits of the Field Board of Inquiry's findings, but not the admissibility of the GOMOR.

Personnel management decisions regarding unfavorable information placed in official military personnel files, including GOMORs, are based on a "[r]eview of official personnel files" and "[t]he knowledge and best judgment of the commander, board, or other responsible authority." See AR 600-37, ¶ 3-1(a). The GOMOR placed in plaintiff's official military personnel in May 2012 stated:

> You are hereby reprimanded for violations of Army Regulation 380-67.
>
> Leaders in the United States Military are expected to exemplify the highest ethical and professional standards as embodied in our Army Values. Leaders are expected to be able to read, understand, and follow regulations, directions, and orders of those appointed over them. You have failed to follow Army Regulations and failed to be forthcoming in relationships that directly impact your ability to continue to serve in your current capacity. You failed to inform the investigating agent about your close, personal relationships with two separate foreign national women, neither of which are your wife. You also admit to not informing your wife of the latter relationship, which you attest is not intimate, yet you still maintain connections through social media networks and communicate professional travel arrangements. Your failure to notify the appropriate servicing security office of close, intimate, or continuous communication or connection with a foreign national can raise questions about your reliability, trustworthiness and ability to protect classified information.

The Army originally initiated elimination proceedings against plaintiff because of "[s]ubstantiated derogatory activity," which resulted in a GOMOR having been filed in plaintiff's official military personnel file, as well as "[c]onduct unbecoming an officer as indicated" in the GOMOR. The Field Board of Inquiry was required by Department of Defense Instruction 1332.30 and AR 600-8-24 to establish the facts of plaintiff's case and to determine whether the proposed bases for elimination were supported by a preponderance of the evidence. See AR 600-8-24, ¶ 4-6 ("[T]he Board of Inquiry establishes and records the facts of the Respondent's alleged misconduct, substandard performance of duty, or conduct incompatible with military service."); Dep't of Def. Instruction 1332.30, Encl. 3 ¶ 3(c)(1) ("The Board of Inquiry is an administrative board that considers all relevant and material evidence about the case . . . ."). Plaintiff

challenged the accuracy of the GOMOR when petitioning the DAESB to remove the GOMOR from his official military personnel file. In plaintiff's brief to the DAESB, plaintiff "outline[d] the factual circumstances" related to the GOMOR and argued that "[n]either of these two contacts [Okasana and Yuliya] were within the criteria established by the AR, and not reporting them should not have been the basis for a GOMOR on any minimally rational or objective basis." On June 26, 2014, after the Field Board of Inquiry convened on March 30, 2014, but before the Board of Review convened on July 10, 2014, and before the Deputy Assistant Secretary approved removal of plaintiff from the Army on August 6, 2014, the DAESB rejected plaintiff's request to remove the GOMOR from his official military personnel file. According to the DAESB, "[a]fter a thorough review of the appellant's official record, the evidence submitted by the appellant in support of his appeal, and the circumstances surrounding the GOMOR incidents, the appellant has failed to provide clear and convincing evidence that the GOMOR is untrue or unjust." As such, although not dispositive, the conclusions in the GOMOR were legitimate entries in plaintiff's official military personnel file, available for future use. The Field Board of Inquiry, therefore, properly considered the GOMOR when determining whether plaintiff should be eliminated from the Army.

<u>Plaintiff's Challenge to the Field Board of Inquiry's Consideration of the Polygraph Examiner's Report</u>

Regarding the Field Board of Inquiry's consideration of the Polygraph Examiner's Report, plaintiff argues that the Field Board of Inquiry should not have considered the Polygraph Examiner's Report because plaintiff was not provided a copy of the raw polygraph data. According to plaintiff, "despite a specific request, the raw polygraph data, such as the charts, was not made available for review and analysis," which plaintiff asserts directly contravenes "the DOD requirement that 'the respondent will be allowed full access to and be furnished copies of records relevant to the case.'" (quoting Dep't of Def. Instruction 1332.30). In response, defendant argues that "[w]e are not aware of any legal authority construing this instruction [Department of Defense Instruction 1332.30], but on its face, it simply prohibits the Government from resisting a request by a soldier for access to and copies of the records that he believes are relevant to his case."

Pursuant to Enclosure 5 of Department of Defense Instruction 1332.30, an officer "will be allowed full access to and be furnished copies of records relevant to the case" when appearing before a Field Board of Inquiry. To support his position that plaintiff requested access to the raw polygraph data and was denied access to the raw polygraph data supporting the Polygraph Examiner's Report, plaintiff only cites to a portion of the transcript of plaintiff's hearing before the DOHA administrative judge. The transcript of plaintiff's hearing with the DOHA administrative judge indicates that, during a conversation between plaintiff and an "administrative attorney" from Fort Meade who was assigned to plaintiff for legal assistance, plaintiff asked his "administrative attorney" for a copy of the raw polygraph data from his polygraph examination. Plaintiff then stated his "administrative attorney" "basically said she wasn't sure that it would be something that was necessary" and "[s]he didn't think it would be anything that would help me." Additionally, at the beginning of plaintiff's proceeding before the Field Board of Inquiry, the President of the Field Board of Inquiry informed plaintiff "of his rights and privileges,

including the right to full access to the records of the hearings and all documentary evidences (excluding classified documents)." Plaintiff indicated that "he desires a record of the proceedings," but the summarized transcript of plaintiff's proceedings before the Field Board of Inquiry does not indicate that plaintiff requested a copy of the raw polygraph data. Plaintiff has not demonstrated that Army officials denied plaintiff's "specific request" for a copy of the raw polygraph data in violation of Department of Defense Instruction 1332.20, or that the Army refused to provide plaintiff with access to the raw polygraph data. Nor has plaintiff demonstrated that the Field Board of Inquiry, which was responsible for determining the facts of plaintiff's case, could not consider the Polygraph Examiner's Report, which was relevant to determining whether plaintiff should be eliminated from the Army. See Dep't of Def. Instruction 1332.30, Encl. 3 ¶ 3(c)(1) ("The Board of Inquiry is an administrative board that considers all relevant and material evidence about the case . . . ."); see also AR 600-8-24, ¶ 4-6. Plaintiff's argument that the Army violated Department of Defense Instruction 1332.20, therefore, also fails.

Unlawful Command Influence

Plaintiff argues that "unlawful command influence permeated the entire process resulting in a singularly unfair procedure." Plaintiff attempts to cite two distinct instances in which unlawful command influence "permeated" plaintiff's elimination proceedings. First, plaintiff alleges the email messages exchanged by plaintiff and Major Frick demonstrate that LTC Cozens tried to "pressure" Major Frick "to urge Exnicios to change his rebuttal to the GOMOR and to virtually acknowledge the facts in the GOMOR." According to plaintiff, the email messages demonstrate that, "[i]f Exnicios did not write his rebuttal the way that the General wanted, there was a very real threat to plaintiff's career," as there "was an implied threat" that a factual response would "'piss off or at least annoy' the General." Second, plaintiff argues that Colonel Pick's, the GOSCA, appointment of the Members of the Field Board of Inquiry and signing of the additional, third basis for elimination "had the effect of telegraphing the Colonel's desire to see Exnicios separated." Plaintiff notes that Colonel Pick "affirmed the results of the BOI, including his own defective basis."

Defendant, however, argues that:

Turning first to the e-mails from Major Frick, the most the Court can read into those e-mails is that Major Frick offered to Mr. Exnicios some career advice to avoid the possibility of having the GOMOR placed in his permanent records, and that although Mr. Exnicios was thankful to receive that advice, he declined to follow it.

(emphasis in original). Defendant also asserts that plaintiff does not "support his assertion that the fact that Colonel Pick both signed the notice of an additional basis for elimination (the revocation of Mr. Exnicios's security clearance) and picked the BOI members 'had the effect of telegraphing the Colonel's desire to see Exnicios separated.'" According to defendant, "in the absence of any facts tending to show that that Colonel Pick exerted any influence on the BOI, Mr. Exnicios has not carried his burden to establish either unlawful command influence."

Pursuant to the statute at 10 U.S.C. § 837 (2012), "[n]o person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case." To establish unlawful command influence, a plaintiff must show "(1) a command relationship, (2) improper influence by virtue of that relationship, and (3) a nexus between the alleged influence and plaintiff's dismissal." Milas v. United States, 42 Fed. Cl. 704, 712 (citation omitted), aff'd, 217 F.3d 854 (Fed. Cir. 1999); see also Werking v. United States, 4 Cl. Ct. 101, 105 (1983) (rejecting a claim of unlawful command influence because "[p]laintiff has neither alleged any facts tending to show improper influence by virtue of any command relationship nor establishing any nexis [sic] between the alleged influence and his dismissal." (citations omitted)).

In the above-captioned case, regarding plaintiff's first claim of unlawful command influence, plaintiff has not demonstrated how Major Frick's email message, in which Major Frick recommended plaintiff provide a two paragraph response in which plaintiff "acknowledge your guilt and apologize for its effect on DIA and the Army" and request that the GOMOR be filed in plaintiff's local file, influenced or was connected in any way to approval by the Deputy Assistant Secretary of the Board of Review's recommendation of elimination. A plain reading of the email messages exchanged between Major Frick and plaintiff indicates that Major Frick was attempting to assist plaintiff with a way to avoid having the GOMOR placed in plaintiff's official military personnel file. Although plaintiff stated that he appreciated Major Frick's advice, plaintiff opted independently not to follow Major Frick's advice and submitted the GOMOR he had previously drafted without any revisions, which indicates plaintiff was not subject to improper influence. Regarding plaintiff's second unlawful command influence claim, plaintiff has not demonstrated that Colonel Pick's appointment of the Members of Field Board of Inquiry and signing of the additional, third basis for elimination regarding the revocation of plaintiff's security clearance impacted plaintiff's elimination proceedings. Colonel Pick, as the GOSCA in plaintiff's elimination proceedings, was the officer required by AR 600-8-24 to appoint the members of the Field Board of Inquiry, as AR 600-8-24, paragraph 4-6(b), states "Boards of Inquiry are appointed by the appropriate GOSCA." See also AR 600-8-24, ¶ 4-6(f) ("The GOSCA will issue the orders appointing the Boards of Inquiry."). Moreover, the Board of Review, the Members of which are appointed by the Secretary of the Army or his designee pursuant to AR 600-8-24, paragraph 4-17(a), reviewed the Field Board of Inquiry's findings and recommendation and also recommended elimination of plaintiff from the Army, which the Deputy Assistant Secretary ultimately approved. Plaintiff also was given the opportunity to object to any appointment of the Board Members but chose not to do so. The court, therefore, rejects plaintiff's unsupported unlawful command influence claims.

Due Process Claims

Regarding plaintiff's due process claims, plaintiff argues that he was denied due process because plaintiff had a "liberty interest" in "the additional active duty pay and future retirement pay that he would have received," plaintiff was not provided with "adequate notice of what he was being charged with," plaintiff "was never allowed the

opportunity to confront or cross examine the [polygraph] examiner" or the individual who provided DIA with the anonymous tip regarding plaintiff's alleged unreported foreign contacts, and plaintiff was not provided with the "complete polygraph file." Plaintiff also contends that he was deprived of due process because he was not provided with a fair hearing as required by Department of Defense Instruction 1332.30 and AR 600-8-24. Defendant does not argue that the court lacks jurisdiction over plaintiff's due process claims; defendant, however, contends that "the Federal Circuit stated that due process is satisfied in the case of a servicemember [sic] being involuntarily discharged when the servicemember [sic] received notice of the charges against him and was given an opportunity to respond." (citing Holley v. United States, 124 F.3d 1462, 1469-70 (Fed. Cir. 1997) (citations omitted)). Defendant further asserts that:

> In accordance with those procedures [prescribed in AR 600-8-24], Mr. Exnicios fully participated before the BOI (where he was represented by counsel), provided to his GOSCA an appellate brief, and had his case heard by the BOR. Before the BOI, he presented both an opening statement and a closing argument, testified on his own behalf, examined witnesses, offered documents into evidence, and was given the opportunity to object to the admission of the Government's exhibits.

When a claim is brought under the Military Pay Act, 37 U.S.C. § 204, which is a money-mandating source of law, the United States Court of Federal Claims may have jurisdiction over the associated due process claims. See Harris v. United States, 868 F.3d at 1381 n.7; see also Holley v. United States, 124 F.3d at 1466 ("The presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act, or bar the court from considering the constitutional issue in the course of determining whether the discharge was wrongful. The determination of Mr. Holley's entitlement to remedy under 37 U.S.C. § 204 may include consideration of whether his removal violated constitutional rights."). If the service member challenges the service member's discharge on constitutional grounds and the constitutional issues do not stand alone from the service member's wrongful discharge claim, the court's "determination of the merits of the claim 'may include consideration of whether his removal violated constitutional rights.'" Volk v. United States, 111 Fed. Cl. at 326 (quoting Holley v. United States, 124 F.3d at 1466). When a service member's discharge is "stigmatizing," due process concerns are implicated, and "'there is an enhanced right to a hearing.'" Clifford v. United States, 59 Fed. Cl. 440, 450 (2004) (quoting Holley v. United States, 124 F.3d at 1470), aff'd, 120 F. App'x 355 (Fed. Cir. 2005). "When there is no stigmatizing discharge, the Due Process Clause is not implicated . . . ." Sutton v. United States, 65 Fed. Cl. 800, 805 (2005); see also Flowers v. United States, 80 Fed. Cl. 201, 224 ("Liberty interests 'are involved only when separation from the military is carried out in such fashion as to stigmatize the separated member, typically by dishonorable discharge.'" (quoting Kinney v. United States, 51 Fed. Cl. 126, 130 (2001)), aff'd, 321 F. App'x 928 (Fed. Cir. 2008), reh'g and reh'g en banc denied (Fed. Cir. 2009). In Holley v. United States, the United States Court of Appeals for the Federal Circuit, when analyzing a "stigmatizing discharge" of an Army officer, concluded that, "[a]pplying these [due process] standards to Mr. Holley's situation, his termination did not violate due process, for he received notice of the charges and an

opportunity to respond before the termination was implemented, as required by [Dep't of Navy v.] Egan[, 484 U.S. 518 (1988)], and it is conceded that the information was not false, as discussed in Codd [v. Velger, 429 U.S. 624, 627 (1977)]." Holley v. United States, 124 F.3d at 1470.

In the above-captioned case, the court would have jurisdiction over plaintiff's due process claims because plaintiff is not asserting a standalone due process claim, but, rather, is asserting that his involuntary discharge "based on both misconduct and moral or professional dereliction" violated his due process rights when he was, allegedly, improperly eliminated from the Army. See Holley v. United States, 124 F.3d at 1466. Regarding the issue of notice, by the memorandum dated February 13, 2013, the United States Army Human Resources Command informed Mr. Exnicios that he needed to show cause for retention because it was initiating elimination proceedings against plaintiff "under the provisions of Army Regulation (AR) 600-8-24, paragraph 4-2(b), because of misconduct, moral or professional dereliction." The United States Army Human Resources Command indicated it was eliminating plaintiff based on the following "specific reasons" for elimination: "a. Substantiated derogatory activity resulting in a General Officer Memorandum of Reprimand dated 2 April 2012 (Encl 1), which was filed in your Official Military Personnel File. b. Conduct unbecoming an officer as indicated by the above-referenced item." (capitalization in original). Although, as discussed above, the notice to plaintiff of a third basis for elimination cited to an apparently incorrectly identified subsection of AR 600-8-24, paragraph 4-2(a), regarding plaintiff's ability to pass the APFT, which was not at issue in plaintiff's elimination proceeding, the notice of plaintiff's third basis for elimination clearly stated that plaintiff was required to show cause for retention "due to the permanent revocation of your security clearance." In accordance with AR 600-8-24, paragraph 4-6(a), the Field Board of Inquiry then convened a hearing, during which plaintiff submitted evidence related to the GOMOR and status of plaintiff's security clearance, called witnesses, cross-examined witnesses, and testified on his own behalf. The Field Board of Inquiry then rationally determined that the evidence supported two findings of misconduct under AR 600-8-24, paragraph 4-2(b), and a finding of substandard performance of duty under AR 600-8-24, paragraph 4-2(a), due to the revocation of plaintiff's security clearance. Plaintiff then submitted an appellate brief to the GOSCA, who reviewed the Field Board of Inquiry's recommendation, and, subsequently, a Board of Review convened a hearing to review the Field Board of Inquiry's recommendation. In sum, plaintiff was provided with notice of the reasons the Army was contemplating elimination of plaintiff and an opportunity to participate throughout the proceedings, including to submit evidence in rebuttal and an in-person hearing, which satisfied the requirements of due process. See Holley v. United States, 124 F.3d at 1470; see also Milas v. United States, 42 Fed. Cl. at 712 ("In this case, plaintiff was given notice and an evidentiary hearing during proceedings before the Board of Inquiry. Therefore, the requirements of due process were satisfied.").

Additionally, plaintiff was not denied due process because he allegedly was not permitted to cross-examine the Polygraph Examiner or the individual who provided DIA with an anonymous tip to DIA regarding plaintiff's alleged unreported foreign contact. Under Department of Defense Instruction 1332.30, the respondent may "request the appearance before the board of any witness whose testimony is considered pertinent to

his or her case. A determination on the availability of the witness, whether the witness is required to appear, and the materiality of the witness, will be made under regulations of the Secretary concerned." Dep't of Def. Instruction 1332.30; see also AR 600-8-24, ¶ 4-11(f) (stating the respondent "[m]ay request that witnesses, whose testimony is relevant to the case, appear before the Board of Inquiry"). Plaintiff has not cited any evidence in the administrative record indicating that plaintiff requested that the Polygraph Examiner or requested the individual who had provided the anonymous tip to DIA appear before the Field Board of Inquiry. Likewise, although plaintiff claims that he was denied due process because he was not provided with a "complete polygraph file," the administrative record is devoid of any evidence indicating that the plaintiff requested the "complete polygraph file" from the Army, and, as discussed above, plaintiff has failed to show that the Army violated Department of Defense Instruction 1332.30 and AR 600-8-24 by not providing a copy of the "complete polygraph file" to plaintiff. The court, therefore, finds that the Army did not violate plaintiff's due process rights during the proceedings which led to eliminating plaintiff from the Army.

Moreover, plaintiff's argument that the Army violated Department of Defense Instruction 1332.30 and AR 600-8-24 by not providing plaintiff with a fair hearing also fails. Plaintiff argues, "[d]espite the weight of the evidence in support of retention the BOI took only 30 minutes to deliberate. The BOR took only ten. This cavalier approach to the case by the decision makers certainly calls the fairness of the proceeding into question." Under Department of Defense Instruction 1332.30, "[a] Board of Inquiry will give a fair and impartial hearing to an officer required to show cause for retention on active duty or in active status." Dep't of Def. Instruction 1332.30, Encl. 3, ¶ 3(c). Similarly, AR 600-8-24 states the "Board of Inquiry's purpose is to give the officer a fair and impartial hearing determining if the officer will be retained in the Army." AR 600-8-24, ¶ 4-6(a). Under AR 600-8-24, paragraph 4-17(a), a Board of Review, "after thorough review of the records of the case, will make recommendations to the Secretary of the Army or his designee as to whether the officer should be retained in the Army." Nothing in Department of Defense Instruction 1332.30 or AR 600-8-24, however, requires that a Field Board of Inquiry or Board of Review spend a set amount of time on deliberations, and the Boards had the records relevant to plaintiff's case prior to the hearings. The administrative record indicates nothing to suggest that either the Field Board of Inquiry or the Board of Review did not review the records of plaintiff's elimination proceedings prior to their deliberations. See Milas v. United States, 42 Fed. Cl. at 719 (rejecting an argument that a Navy Board of Review did not adequately consider evidence when it "convened for only four hours" because the applicable statute and regulation did not define the word "review," and "[t]he court is loathe [sic] to impose additional requirements on a procedure which Congress expressly granted the Secretary of the Navy discretion to devise"). Additionally, as discussed above, the evidence before the Field Board of Inquiry and Board of Review supported each of the Board's findings and recommendations.

## CONCLUSION

The court **DENIES** defendant's motion to dismiss regarding justiciability. The court **GRANTS** defendant's motion to dismiss regarding waiver of plaintiff's claims that the Field Board of Inquiry should not have received as evidence the Polygraph Examiner's

Report, that the additional, third basis at issue in plaintiff's elimination proceeding regarding the revocation of plaintiff's security clearance was "facially defective," that "[t]he record does not show that Exnicios lost his Secret clearance," that the elimination proceedings were tainted by unlawful command influence, and that the Army did not provide plaintiff with due process. The court **GRANTS** defendant's cross-motion for judgment on the administrative record regarding whether plaintiff's elimination proceedings were arbitrary and capricious. The court **DENIES** plaintiff's cross-motion for judgment on the administrative record. Plaintiff's complaint is **DISMISSED** entirely. The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion.

      **IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**
